CITY OF BOSTON *vs.* TREASURER AND RECEIVER GENERAL & others.

Suffolk.   November 16, 17, 1920. — February 28, 1921.

Present: RUGG, C. J., BRALEY, DE COURCY, CROSBY, & PIERCE, JJ.

*Contract,* What constitutes. *Constitutional Law,* Government operation of public utility. Due process of law. *Tax,* To support public utility. *General Court. Boston Elevated Railway Company. Equity Pleading and Practice,* Bill. *Evidence,* Matter of common knowledge. *Words,* "Take possession."

Spec. St. 1918, c. 159, having been accepted by the railway companies, constitutes an agreement between the Boston Elevated Railway Company and the Commonwealth that the latter shall take over the management and operation of the railway company and shall pay therefor the amounts specified in way of compensation for the use thereof.

The operation of the Boston Elevated Railway system through trustees appointed by the Governor under Spec. St. 1918, c. 159, was undertaken, not as a source of profit, but solely for the general welfare.

The Commonwealth, acting through the General Court, has the constitutional power to assume the management and operation of the Boston Elevated Railway system.

Spec. St. 1918, c. 159, delegates no legislative powers to the trustees of the Boston Elevated Railway Company.

In a suit in equity by the city of Boston against the Treasurer and Receiver General of the Commonwealth, the Boston Elevated Railway Company and the trustees who are operating that railway under Spec. St. 1918, c. 159, to have certain provisions of that statute declared unconstitutional and void against the city of Boston and to prevent the assessment upon that city of any part of the amount paid under the statute by the Commonwealth to the railway company to make up the deficiency between its revenue and expenses, the bill averred that the railway was badly run down and depreciated when it came under management of the trustees, and that the amount charged for a single year by the trustees for depreciation of the railway and the deficiency certified by the trustees to the Treasurer and Receiver General for assessment upon the cities and towns under Spec. St. 1918, c. 159, § 14, were "excessive, unreasonable, unnecessary and illegal." Upon demurrer to the bill it was *held*, that

(1) The general averments "excessive, unreasonable, unnecessary and illegal," standing alone and without statement of definite acts or facts which might accurately be described by such expletives, were of no consequence and did not merit judicial inquiry and were not admitted by the demurrers;

(2) The facts specifically set forth in the bill showed nothing rendering the assessment of the deficiency contrary to any constitutional guaranty;

(3) The effect of the statute upon its acceptance being essentially a lease of the railway property to the Commonwealth, or at least a contract for public operation upon terms agreed upon with the corporation, the extent of the right in the property to be used by the public and the determination of the amount to be paid therefor by agreement with the corporation were within the power of the Legislature;

(4) It is matter of common knowledge that the period after the opening of the Great War and at the time of the passage of Spec. St. 1918, c. 159, was one of extraordinary difficulty and abnormal conditions for the operation of street railways;

(5) Whether the bargain made by the Commonwealth with the Boston Elevated Railway Company for the rehabilitation of the property of that company was wise or not was not a judicial question, but was a question to be settled by the Legislature;

(6) The provisions for rehabilitation of the railway property were in the nature of compensation to be made for the use of the property, and were in no sense a gratuity to its stockholders; and by the enactment of the statute the General Court determined that those provisions were reasonable compensation for such use;

(7) It was not essential that specific amounts to be charged for depreciation be determined by the Legislature: that was a matter properly left to the trustees;

(8) There was nothing in the record to warrant the inference that the trustees transcended their powers or failed to conform to the provisions of the act.

The city of Boston is not, and under Spec. St. 1918, c. 159, cannot be deprived of its property without reasonable compensation.

Spec. St. 1918, c. 159, does not make any taking or authorize any seizure under the powers of eminent domain of the subways or tunnels in Boston.

The word "take" in the phrase in Spec. St. 1918, c. 159, § 2, that the trustees "subject to the provisions of this act, shall take and have possession of said properties" referring to the "properties owned, leased or operated by" the Boston Elevated Railway Company, is not used in the sense of expropriate or seize under eminent domain; but it means that the trustees shall take possession and continue to have possession of the properties under the terms of the act and imports a possessory right only.

Under Spec. St. 1918, c. 159, the trustees have acquired, and possess authority to acquire, in the subways and tunnels in Boston only the rights therein of the railway company under its leases.

Spec. St. 1918, c. 159, neither constitutes nor authorizes a present taking under the power of eminent domain, or one suspended until or operative upon the expiration of the leases of the subways and tunnels in 1936.

The provisions of Spec. St. 1918, c. 159, § 14, authorizing the assessment of any deficiency arising under §§ 11 and 13 upon the cities and towns in which the railway company is operated, in proportion to the number of persons using the service in accordance with computations made by the trustees, is an exercise of the power of taxation for a public purpose and is not unconstitutional.

The circumstance that an existing municipal governmental agency was used for the assessment and collection of a tax for a public purpose gives that existing municipal governmental agency, so far as it has proprietary rights, no ground for complaint.

Spec. St. 1918, c. 159, violates no constitutional right of the city of Boston.

BILL IN EQUITY, filed in the Supreme Judicial Court on July 18, 1919, and afterwards amended, by the city of Boston against the Treasurer and Receiver General of Massachusetts, the Boston Elevated Railway Company and the trustees who were operating that railway under Spec. St. 1918, c. 159, setting forth the facts stated in the opinion and praying that "an injunction be issued against the Treasurer and Receiver General restraining him from paying to the Company the amount which the trustees have notified him he is to pay and which he proposes to pay; that said c. 159 of the Special Acts of 1918 be declared unconstitutional and null and void; that the trustees of the company be perpetually enjoined from determining the amount of the deficiency between income and cost of service as defined in said c. 159, and from notifying the Treasurer and Receiver General thereof; that the Treasurer and Receiver General of the Commonwealth be perpetually enjoined from assessing upon the plaintiff the whole or any part of any amount or amounts which the Commonwealth has paid or

shall pay to the company or from issuing any warrant in connection therewith or attempting to levy upon the plaintiff any tax for any part of such amount or amounts" and for general relief.

A demurrer was filed by the Treasurer and Receiver General upon the grounds that

"1. The plaintiff has no standing to bring a bill in equity against him on the grounds therein set forth.

"2. Said bill cannot be maintained against this defendant in his capacity of Treasurer and Receiver General of the Commonwealth.

"3. Said bill sets forth no grounds for relief in equity against this defendant."

A demurrer was filed by the trustees of the Boston Elevated Railway Company and by that company upon the grounds

"1. That the bill sets out no cause of action against these defendants substantially in accord with the law and statutes of this Commonwealth.

"2. That it appears on the face of the bill that these defendants are acting merely as agents and officers of this Commonwealth and this bill is in effect a proceeding against the Commonwealth in its own courts in a manner and for a cause not permitted by its statutes.

"3. That the bill in effect attempts to restrain these defendants as agents of the Commonwealth from exercising the discretionary powers conferred upon them by Spec. St. 1918, c. 159, § 14, to determine and report to the Treasurer and Receiver General the amount to be assessed upon the city of Boston, and this court has no jurisdiction to entertain such a bill.

"4. That the bill seeks to restrain the Treasurer and Receiver General from paying over to these defendants moneys which he is required by statute to pay, and this plaintiff has no interest in such payment or any interest until the Commonwealth seeks to recover from the plaintiff some portion of the sum so paid over.

"5. That the plaintiff is a municipal corporation of this Commonwealth and these respondents are now operating a great public utility lying partly within the boundaries of the plaintiff under legislative authority and direction, and, as such legislation is binding upon the plaintiff, it has no standing in this court to object to any burden imposed upon it by the Legislature.

"6. That the bill seeks to raise questions of a purely administrative or discretionary nature, which have been delegated by the Legislature to these defendants, and of which this court has no jurisdiction.

"7. That the allegations in the sixth paragraph of the bill that the determination by these defendants as to proper charges for repairs, maintenance, and depreciation is 'excessive, unreasonable, unnecessary, and illegal' state conclusions of law merely, and no facts are stated upon which such conclusions can be properly founded.

"8. That, in so far as the bill complains of a failure by the defendant Boston Elevated Railway Company to comply with its obligations to the plaintiff, the bill sets out no ground of relief therefor against these defendants, but the plaintiff has a plain, adequate and complete remedy at law for breach of contract.

"9. That, in so far as the bill complains of the expenditures of these defendants for maintenance and repairs, such expenditures were placed by the Legislature within their discretion, and there is no allegation that they have not acted in good faith or otherwise than in accordance with the discretionary powers conferred upon them by Spec. St. 1918, c. 159.

'10. That, in so far as the bill complains of the amount charged by these defendants for depreciation, there is no allegation that they have not acted in good faith or otherwise than in accordance with the discretionary powers conferred upon them by Spec. St. 1918, c. 159."

The case came on to be heard upon the substitute bill of complaint and the demurrers before *Loring,* J., who overruled the demurrers and being of opinion that such order so affected the merits of the controversy that its correctness should be determined before further proceedings, reported the case for determination by the full court.

Material portions of Spec. St. 1918, c. 159, are as follows:

"Section 9. Whenever the income of the company is insufficient to meet the cost of the service as herein defined, the reserve fund shall be used as far as necessary to make up such deficiency, and whenever, on the other hand, such income is more than sufficient to meet the cost of the service, the excess shall be transferred to and become a part of the reserve fund."

"Section 11. If, as of the last day of June in the year nineteen hundred and nineteen, or the last day of any December or June thereafter, the amount remaining in the reserve fund shall be insufficient to meet the deficiency mentioned in section nine, it shall be the duty of the trustees to notify the Treasurer and Receiver General of the Commonwealth of the amount of such deficiency, less the amount, if any, in the reserve fund applicable thereto, and the Commonwealth shall thereupon pay over to the company the amount so ascertained. Pending such payment it shall be the duty of the trustees to borrow such amount of money as may be necessary to enable them to make all payments, including dividend payments, as they become due. If, as of the last day of any June or December thereafter during the period of public operation, the reserve fund shall exceed the amount originally established, the trustees shall apply the excess, so far as necessary, to reimbursing the Commonwealth for any amounts which it may have paid to the company under the provisions hereof, and the Commonwealth shall thereupon distribute the amount so received among the cities and towns in which the company operates, in proportion to the amounts which they have respectively been assessed as provided in section fourteen.

"In order to meet any payment required of the Commonwealth under the provisions of this section the Treasurer and Receiver General may borrow at any time, in anticipation of the assessments to be levied upon the cities and towns, such sums of money as may be necessary to make said payments, and he shall repay any sums so borrowed as soon after said assessments are paid as is expedient."

"Section 13. It shall be the duty of the trustees to maintain the property of the company in good operating condition and to make such provision for depreciation, obsolescence and rehabilitation, that, upon the expiration of the period of public management and operation, the property shall be in good operating condition. If the period of public management and operation expires, control of the property shall then revert to the company, and if at that time the reserve fund shall be less than the amount originally established because the income during the period of public management and operation has been insufficient to pay the cost of the service, the Commonwealth shall forthwith pay over

to the company an amount sufficient to restore it to its original amount; and if the amount in said reserve fund is then in excess of the amount originally established and any amount required to meet the cost of the service to the expiration of such period, such excess shall be paid into the treasury of the Commonwealth and distributed among the cities and towns in which the company operates in the same proportions as the assessments provided for by section fourteen.

"Section 14. In case the Commonwealth shall be called upon to pay to the trustees or the company any amount under the provisions of sections eleven and thirteen, such amount with interest or other charges incurred in borrowing money for the purpose shall be assessed upon the cities and towns in which the company operates by an addition to the State tax next thereafter assessed in proportion to the number of persons in said cities and towns using the service of the company at the time of said payment, said proportion to be determined and reported to the Treasurer and Receiver General by the trustees from computations made in their discretion for the purpose."

*T. Hunt,* for the Boston Elevated Railway Company.

*H. W. Barnum,* (*C. H. Waterman* with him,) for the trustees of the Boston Elevated Railway Company.

*A. Lincoln,* Assistant Attorney General, for the Treasurer and Receiver General.

*A. D. Hill & N. Matthews,* for the plaintiff.

RUGG, C. J.   This is a suit in equity by the city of Boston against the Treasurer and Receiver General, the Boston Elevated Railway Company and the trustees who are operating that railway under Spec. St. 1918, c. 159.   Its object is to have certain provisions of that act declared unconstitutional and void as against the city of Boston, and to prevent the assessment upon that city of any part of the amounts paid under the act by the Commonwealth to the railway company to make up the deficiency between its revenues and expenses.   We are of opinion that the plaintiff fails to make out a case on the merits.   It has been argued at large by all parties.   It is of great public importance.   We therefore have not considered several preliminary questions which have been suggested and argued.   Since the decree would be the same in any event, there appears "to be no ob-

jection to stating the grounds of substantive law which seem to us to support the result." Holmes, C. J., in *Browne* v. *Turner,* 176 Mass. 9, 12. To that end and for the same reason the amendment is allowed admitting the present Treasurer and Receiver General in place of the one named in the petition, who has vacated that office.

In an opinion of the justices given to the honorable Senate and reported in 231 Mass. 603, the view was expressed that Spec. St. 1918, c. 159, violated no provision of the State or Federal Constitutions. The familiar rule is that such opinions are wholly advisory, given by the justices as individuals without the benefit of argument, and are not decisions of the court. When the questions therein considered arise in the course of litigation, the ground is re-examined by the justices sitting as a court in the light of the arguments presented and with the effort carefully to guard against any influence flowing from the earlier opinion. *Young* v. *Duncan,* 218 Mass. 346, 351, *Perkins* v. *Westwood,* 226 Mass. 268, 272, and cases collected in each judgment.

The allegations of the bill in substance are that by virtue of St. 1902, c. 534, and St. 1911, c. 741, the city of Boston has expended about $31,000,000 in the construction of subways and tunnels and has leased the same to the railway company, whereby all these subways and tunnels and also those built by it under earlier statutes, and the rents and profits thereof, are held by the city "in its private or proprietary capacity, for its own property" never to be taken by the Commonwealth except on payment of just compensation. The leases, which have been extended to July 1, 1936, provide for repairs by the lessee and maintenance of the demised property in good condition, and give the city the right of entry upon default in payment of rent. The essential parts of said c. 159 are stated in or by reference imported into the bill. That act provides for public operation of the railway through a board of five trustees appointed by the Governor, who "shall manage and operate the Boston Elevated Railway Company . . . and the properties owned, leased or operated by it, for a period of ten years," and thereafter upon the same terms until such time as the Commonwealth shall elect to discontinue public management and operation, and who, subject to the provisions of the act, "shall take and have possession of said properties in behalf

of the Commonwealth," with "the right to regulate and fix fares," transfers and other charges, and to "determine the character and extent of the service and facilities to be furnished." The railway company is required to raise $3,000,000 by the issuance of preferred stock with dividends not to exceed seven per cent, for the improvement of the property of the company and the establishment of a reserve fund. The trustees are directed to "fix such rates of fare as will reasonably insure sufficient income to meet the cost of the service, which shall include operating expenses, taxes, rentals, interest on indebtedness, such allowance as they may deem necessary or advisable, for depreciation of property and for obsolescence and losses," fixed dividends on preferred stock and dividends on the common stock at the rate of five per cent for the first two years, five and one-half per cent for the next two years and six per cent for the remainder of the period of public operation. If there is a deficiency between the cost of operation as thus defined and the receipts, the trustees are required to notify the Treasurer and Receiver General and the Commonwealth shall thereupon pay the amount of the deficit ascertained according to the act. The trustees are required to maintain the property of the railway company in good operating condition and to make such provision for depreciation, obsolescence and rehabilitation; that upon the expiration of the period of public management, the property shall be "in good operating condition," and shall then revert to the railway company. In case the Commonwealth is called upon to make payments to the trustees to meet deficits or diminution of the reserve fund provided for in the act, such amounts shall be assessed upon the several cities and towns in which the railway company operates by addition to the State tax next thereafter assessed in proportion to the number of persons in said cities and towns using the service of the company at the time of the payments as determined by the trustees. The act contains provision for acceptance by stockholders of the Boston Elevated Railway Company, and of the West End Street Railway Company, but not by the city of Boston; that none of its provisions shall be construed to constitute a contract binding on the Commonwealth except those which define the terms and conditions under which the property shall be managed and operated by the trustees and the provisions of § 13

relating to the upkeep of the railway company's property. The bill further alleges the appointment of trustees, performance of their functions, and the existence of a deficit of nearly $4,000,000 as determined by the trustees, on July 18, 1919, notice whereof has been given to the Treasurer and Receiver General, who proposes to pay the amount to the company; that in ascertaining this deficit the trustees have charged for the fiscal year ending June 30, 1919, depreciation of approximately $2,000,000 and $2,300,000 for maintenance and repair, the average amount charged by the railway company for depreciation for the ten years prior thereto having been about $98,000 each year and having been inadequate, in consequence whereof the property had run down and was badly depreciated; that the amounts thus charged by the trustees for depreciation and maintenance and repairs are "excessive, unreasonable, unnecessary and illegal;" and that if assessment of this deficit is made according to the act, the plaintiff, as one of the cities liable therefor under the act, will be called upon to pay a very large proportion of any sum paid by the Commonwealth to the railway company. All the defendants demurred to the bill. One common ground is want of equity. Additional grounds of demurrer are set up by the trustees and by the Boston Elevated Railway Company.

Some analysis of the provisions of Spec. St. 1918, c. 159, is necessary in order to deal with the contentions that it is unconstitutional. Its general scope is indicated by its title, which is, "An Act to provide for the public operation of the Boston Elevated Railway Company." The accuracy of the title is confirmed by the substance of the act throughout. Its purpose is operation through public officers and not public ownership. That is shown by the manifest tendency of its main provisions and is accentuated by § 16, whereby definite terms for a sale to the Commonwealth or any political subdivision thereof, "at any time during the period of public management and operation," of the "whole assets, property and franchises" of the Boston Elevated Railway Company "as a going concern," are set forth, together with a further precautionary clause to the effect that the power of eminent domain is not thereby suspended. Examination in detail of the provisions of the act discloses that there is no inexorable legislative mandate that such public operation be

undertaken. There is no power conferred upon the trustees to seize by eminent domain or to acquire in any other way ownership of the railway system of the railway company. It is expressly provided by § 18 that the act, with the exception of § 5 giving the company power to raise $3,000,000 by issuing preferred stock to that amount, shall take effect only upon its acceptance by majority vote of the stockholders of the two railway companies to be affected. In substance and effect the act is a proposition made by the Commonwealth to the two railway companies for their consideration and action. If either rejects that proposition, all goes for naught. If they both accept, then the act becomes vital and binding according to its terms. Those terms are contractual in their nature. That is plain not only from the general scope of the act but from the express provision in § 18, that none of the provisions of the act shall constitute a contract binding upon the Commonwealth except those which define the terms and conditions of the management and operation of the property of the railway company by the trustees, and those of § 13, which constitute a contract binding upon the Commonwealth. The provisions of § 13 relate to the maintenance of the property of the railway company in good operating condition and the restoration of the reserve fund, if depleted, to its original amount upon the expiration of the period of public management. In essence this act, having been accepted by the railway companies, constitutes an agreement between the Boston Elevated Railway Company and the Commonwealth that the latter shall take over the management and operation of the railway company and shall pay therefor the amounts specified in way of compensation for the use thereof. The public operation is undertaken by the Commonwealth, not as a source of profit, but solely for the general welfare. The main design of the act is public operation of the railway company at such rates of fare to be fixed by the trustees from time to time as shall afford revenue sufficient to defray all charges and the dividends established by the act.

The Commonwealth, acting through the General Court, has the constitutional power to assume the management and operation of the Boston Elevated Railway Company system. The reasons may be stated briefly. It is matter of common knowledge that the passenger transportation service for Boston and its suburbs

is chiefly by the means afforded by that system through lines of electric railways on the surface, by elevated structures and through tunnels and subways. Under modern conditions the nature of that transportation system as to adequacy, efficiency, speed, safety, comfort and expense and in other respects relates to the accommodation of the public and concerns the public welfare. There is no distinction in principle between the management and operation of such a transportation system by a public agency established by the Legislature and the taking over by counties, cities and towns of toll bridges and turnpikes, originally private enterprises. The validity of such takings is settled. *Andover & Medford Turnpike Corp.* v. *County Commissioners*, 18 Pick. 486. *Murray* v. *County Commissioners*, 12 Met. 455. *Central Bridge Corp.* v. *Lowell*, 4 Gray, 474; *S. C.* 15 Gray, 106. It has been held that public ownership and operation of a ferry, *Attorney General* v. *Boston*, 123 Mass. 460, the construction at public expense for the uses of a street railway of the Boston subway, *Prince* v. *Crocker*, 166 Mass. 347, and of the East Boston Tunnel, *Browne* v. *Turner*, 176 Mass. 9, all are valid under the Constitution. The grant of public money or aid for the construction of railroads has been made in numerous instances. See statutes collected in *Kingman, petitioner*, 153 Mass. 566, 570. Statutes have been enacted authorizing cities and towns to subscribe for the stock of railroads. *Kittredge* v. *North Brookfield*, 138 Mass. 286. *Commonwealth* v. *Williamstown*, 156 Mass. 70. The ownership and management of the Troy and Greenfield Railroad was taken over by the Commonwealth. *Troy & Greenfield Railroad* v. *Commonwealth*, 127 Mass. 43. *Amstein* v. *Gardner*, 134 Mass. 4. Property invested in street railways by private investors becomes thereby affected with a public interest. *Donham* v. *Public Service Commissioners*, 232 Mass. 309. In the light of these decisions of our own court the constitutionality of the act, so far as it provides for public operation of the elevated railway system, is beyond question. There are decisions in other jurisdictions to the effect that such an enterprise may be made a municipal function. *Sun Printing & Publishing Association* v. *Mayor of New York*, 152 N. Y. 257. *Walker* v. *Cincinnati*, 21 Ohio St. 14. *Platt* v. *San Francisco*, 158 Cal. 74, 81, 82. *Barsaloux* v. *Chicago*, 245 Ill. 598.

Four main objections are urged against the constitutionality

of the act, so far as it concerns the city of Boston. These will now be considered.

1. The bill avers in effect that the trustees have charged for depreciation for a single year $2,000,000, while the railway company itself had for a period of ten years last prior to the inauguration of public management charged annually therefor only $98,000, and that owing to such inadequate charges for depreciation by the company and its failure to use sufficient money for maintenance and repairs, its property when it came under the management of the trustees was badly run down and depreciated and hence the trustees felt obliged in these respects to make up in large part for the neglect of the company in the past, and had charged for maintenance and repairs a sum in excess of $2,000,000, and that the amounts thus charged by the trustees are "excessive, unreasonable, unnecessary and illegal," and that hence the deficiency certified by the trustees to the Treasurer and Receiver General for assessment upon the cities and towns under § 14 of the act is "excessive, unreasonable, unnecessary and illegal." This allegation sets forth no ground for relief in equity. The general averments "excessive, unreasonable, unnecessary and illegal," standing alone and without statement of definite acts or facts which might accurately be described by such expletives, are of no consequence and do not merit judicial inquiry, and of course are not admitted by the demurrers. *Nichols* v. *Rogers,* 139 Mass. 146. *Butler* v. *Directors of the Port of Boston,* 222 Mass. 5, 8. *Lothrop Publishing Co.* v. *Lothrop, Lee & Shepard Co.* 191 Mass. 353. *Marsch* v. *Southern New England Railroad,* 230 Mass. 483, 494. The facts specifically set forth show nothing rendering the assessment of the deficiency contrary to any constitutional guaranty. Great depreciation of the property of the railway company under its own management is alleged. That fact must be presumed to have been within the contemplation of the General Court when c. 159 was enacted. Rehabilitation of its property is necessarily authorized by § 13 so far as may be required in order to return its property to the railway company at the expiration of public control "in good operating condition." That was one of the terms of the offer made by the Commonwealth to the railway companies as an inducement for them to accept the act and become bound by its terms. The effect of the act when accepted,

as it has been, was in its essential features a lease of the railway property to the Commonwealth, or at least a contract for public operation upon stipulated terms. The extent of right in the property of the railway company to be used for the public was within the power of the Legislature. *Boston* v. *Talbot,* 206 Mass. 82. The compensation to be paid by the Commonwealth was a subject which might be determined by the Legislature. Manifestly it was rational to make adequate provision in the management of property of this nature for charges for depreciation, obsolescence, repair and maintenance. *Stein* v. *Strathmore Worsted Mills,* 221 Mass. 86, 89. If the Commonwealth had seized by exercise of eminent domain the precise rights acquired by agreement through acceptance of the act by the railway companies, it would have been obliged to pay reasonable compensation therefor. There would be no constitutional reason why that reasonable compensation could not be fixed by agreement, the Legislature representing the Commonwealth. Said Chief Justice Shaw in *Boston & Lowell Railroad* v. *Salem & Lowell Railroad,* 2 Gray, 1, at page 32, "in addition to the lawmaking power, the Legislature is the representative of the whole people, with authority to control and regulate public property and public rights, to grant lands and franchises, to stipulate for, purchase and obtain all such property, privileges, easements and improvements, as may be necessary or useful to the public, to bind the community by their contracts therefor, and generally to regulate all public rights and interests." Referring to the accommodation of the public as to means of travel and transportation, it was said in *Commonwealth* v. *Boston & Maine Railroad,* 3 Cush. 25, at pages 45, 46, "the government may adopt whatever means they deem expedient for obtaining such accommodation. They may do it by a tax or charge on towns or counties, or by direct appropriations from the public treasury, or by grants of land. . . ."

It is matter of common knowledge, and has come to the attention of the court in cases to be decided, that the period after the opening of the Great War and at the time of the passage of this act was one of extraordinary difficulty and abnormal conditions for the operation of street railways. *Donham* v. *Public Service Commissioners,* 232 Mass. 309, 324. That circumstance doubtless affected in part the compensation for the use of the Boston

Elevated Railway system agreed upon between the Commonwealth and the railway company through the enactment of the statute by the Legislature and its acceptance by the railway companies. The investment in the property of the Boston Elevated Railway Company by its stockholders had been made subject to our laws against stockwatering, and in other respects designed to secure only honest investment in property of that nature. The provisions of the act for the rehabilitation of the property of the railway company constitute in no sense a gratuity to its stockholders. Whether the bargain made by the Commonwealth with the Boston Elevated Railway Company was wise or not is not a judicial question. That was a matter to be settled by the Legislature. *Brayton* v. *Fall River,* 124 Mass. 95. *Hamilton* v. *Kentucky Distillers & Warehouse Co.* 251 U. S. 146, 161. A street railway system was turned over for public management in return for the provisions made in the statute for the benefit of the owner. All those provisions, including that for rehabilitation of the railway property, are in the nature of compensation to be made for the use of the property. By the enactment of the statute the General Court determined that those provisions are reasonable compensation for such use.

It was not essential that the specific amounts to be charged for depreciation be determined by the Legislature. That was a matter which might be left to men of experience, to be appointed by the Governor, to decide as a practical question. *Scituate* v. *Weymouth,* 108 Mass. 128. *Hingham & Quincy Bridge & Turnpike Corp.* v. *County of Norfolk,* 6 Allen, 353. *Boston* v. *Chelsea,* 212 Mass. 127, 130. *Opinion of the Justices,* 234 Mass. 612, 617. *Commonwealth* v. *Slocum,* 230 Mass. 180, and cases collected at page 190. *Lynn* v. *County Commissioners,* 148 Mass. 148. *De las Casas, petitioner,* 180 Mass. 471, 472. *Kingman, petitioner,* 170 Mass. 111, 119. This was not a delegation of legislative power to the trustees. It conferred upon them powers of a kind which have been exercised in this Commonwealth by kindred bodies for many years. They have been recognized too long as not violative of any constitutional guaranty or provision now to be open to question. *Brown* v. *Boston & Maine Railroad,* 233 Mass. 502, and cases collected at page 511. Every rational presumption must be made in favor of the decision of men thus appointed.

Their conclusion would not be set aside unless unsupported, in law. *Mayor & Aldermen of Springfield, petitioners,* 234 Mass. 578, and cases collected at page 583.

There is nothing on this record to warrant the inference that the trustees have transcended their powers or failed to conform to the provisions of the act.

2. The city of Boston is not, and under the act cannot be, deprived of its property without reasonable compensation. It was provided in St. 1902, c. 534, § 19, and St. 1911, c. 741, §§ 4, 9 and 13, that the city of Boston owns "in its private or proprietary capacity, for its own property" the subways and tunnels in Boston. Without pausing to discuss the meaning of those provisions, it is assumed in favor of the city of Boston that its property rights therein are of such a nature as to be within the protection of the constitutional principle declared in *Mount Hope Cemetery* v. *Boston,* 158 Mass. 509, and that they cannot be appropriated to other public uses or to use by another public agency without making reasonable compensation to the city. Giving to the city of Boston the benefit of the fullest sweep of that principle, there is nothing contrary to it in c. 159. That act does not make any taking or authorize any seizure under the power of eminent domain of the subways or tunnels. Those structures are alleged in the bill to be now under lease to the Boston Elevated Railway Company by leases expiring in 1936. The trustees are directed in c. 159, by § 1, to "assume the management and operation of the company's property," and by § 2, to "manage and operate the Boston Elevated Railway Company . . . and the properties owned, leased, or operated by it." These phrases manifestly do not authorize any taking of the subways or tunnels. The trustees must assume control of the rights of the railway company under its leases, but they can go no further than that. By § 2, the trustees, "subject to the provisions of this act, shall take and have possession of said properties in behalf of the Commonwealth during the period of public operation." As matter of grammatical construction, the word "take" in this context has for its object the word "possession." It is not used in the sense of expropriate or seize under eminent domain. The phrase means that the trustees shall take possession and continue to have possession of the properties under the terms of the act. That a possessory

right only is intended is clear from the subsequent clause in § 2, to the effect that "In the management and operation of the said company and of the properties owned, leased or operated by it, as authorized by this act, the trustees . . . shall be deemed to be acting as agents of the company. . . ." The description of the properties, possession of which the trustees are to take and hold, is not broad enough to include anything more than the rights of the railway company therein. It does not go far enough to include underlying ownership where the company has only a leasehold interest. The words of the statute fall short of empowering the trustees to take the subways under eminent domain. The act as a whole makes plain that no seizure by eminent domain is contemplated. That power is recognized in § 13 as not having been exercised and the existence of the possibility of its exercise in the future is there avowed.

It is not alleged in the bill that in the leases of the subways and tunnels to the railway company there is any provision against an assignment of all its rights under the leases by the railway company. In the absence of any such provision, the lessor cannot complain of an assignment by the lessee of its rights. *Patten* v. *Deshon,* 1 Gray, 325. *Peters* v. *Stone,* 193 Mass. 179. *Essex Lunch, Inc.* v. *Boston Lunch Co.* 229 Mass. 557. The trustees have acquired, and possess authority under the act to acquire, in the subways and tunnels, only the rights therein of the railway company under its leases. The facts set forth in the bill do not constitute a taking of any property right of the city of Boston.

A change in the management of the railway company obviously cannot be a taking of the city's property in the subways and tunnels. Such change of management might be accomplished by a sale of the stock by its stockholders, of which the city could not complain. *Brightman* v. *Bates,* 175 Mass. 105, 111.

Even if possession by the trustees is possession by the Commonwealth, the city has no ground for complaint. For failure to perform the covenants of the lease, it has a right of action against the company under § 2 of the act constituting the trustees agents of the railway company. It is made the express duty of the trustees by § 3 "to cause to be paid all the amounts which may from time to time become due from the company." The payment of rental is thus made at least as secure as it has been hith-

erto.  No contractual right of Boston is impaired in any particular.  All the rights that it had before the enactment of the statute are preserved in full force and something of value has been added.

3.  The act neither constitutes nor authorizes a taking, either in the present or suspended until or operative upon, the expiration of the leases in 1936.  The trustees have not acquired and have no power to obtain any higher or other rights in the subways and tunnels than the railway company owns.  The circumstance that under § 12 the period of public control may extend beyond the time when the leases expire in 1936 is of no consequence in this connection.  The trustees will have no greater right in the subways and tunnels after the expiration of the leases than the railway company would have.  The city will have power to enforce whatever rights of possession it may have in the subways and tunnels after the expiration of the leases in 1936, regardless of the fact that public operation may not then have been discontinued.  Considering the trustees as representatives of the Commonwealth in this particular, the city would have the same right to maintain a writ of entry against the Commonwealth as against the railway company both before and after the expiration of the leases.  G. L. c. 237, § 2; c. 245, §§ 9, 12.

4.  The provisions of § 14, authorizing the assessment of any deficiency arising under §§ 11 and 13 upon the cities and towns in which the railway company is operated, in proportion to the number of persons using the service in accordance with computations made by the trustees, is not unconstitutional.  This is an exercise of the power of taxation.  The purpose for which it is put forth is a public purpose.  That point already has been elaborated in this opinion.  It is a purpose for which public money may be appropriated.  It is to be levied in a manner long sanctioned by the customs of this Commonwealth.  *In re Metropolitan Park Commissioners, petitioners*, 209 Mass. 381 and cases collected at page 384.  *Boston, petitioner*, 221 Mass. 468.  *Duffy* v. *Treasurer & Receiver General*, 234 Mass. 42, 52.  The apportionment of the tax established by § 14 falls ratably upon the cities and towns in proportion to benefits derived from the use of the railway system without regard to the location of subways or tunnels.  It is not, however, essential that a tax of this sort be

apportioned according to benefits received by localities. *Mayor & Aldermen of Springfield, petitioners,* 234 Mass. 578, 582, 583. *Duffy* v. *Treasurer & Receiver General,* 234 Mass. 42, 52. The fact that some of the money raised by taxation or the whole of this particular increment of taxation may go toward making up a deficiency caused in part by payment of rentals due to Boston under the subway and tunnel leases is not decisive in this connection. The two capacities are utterly separate and entirely disconnected. The building of the subways was a public purpose. The city rightfully was given a right to rent them to the railway company. The making of such leases in no way impaired or limited the right of the State to tax for any lawful purpose. The principle of *Norwood* v. *Baker,* 172 U. S. 269, has no relevancy to the facts here disclosed. The illustrations put in argument are pertinent. Boston in its proprietary character as owner, entitled to rent of its property leased to the railway company, has no more legal ground to complain of taxes assessed upon its inhabitants for the maintenance of a transportation service than has the owner of a public bond taxed in part to pay interest on public bonds, or the owner of a parcel of real estate taxed in part to pay damages caused by the taking from him of another parcel for some public use. Private individuals owning property leased to the railway company would have equal cause for complaint with respect to taxes assessed upon them. Boston, however, is not assessed in its proprietary capacity at all. So far as concerns assessment of taxes, it is adopted for convenience as a taxing district. In this particular its functions are exclusively governmental. The Legislature might have made it a part of a larger or different taxing district for this purpose and might have levied and collected taxes through different agencies. *Kingman, petitioner,* 153 Mass. 566. *Adams, petitioner,* 165 Mass. 497. *In re Metropolitan Park Commissioners, petitioners,* 209 Mass. 381. *Duffy* v. *Treasurer & Receiver General,* 234 Mass. 42. *Opinion of the Justices,* 234 Mass. 612. The circumstance that an existing municipal governmental agency was used for the assessment and collection of a tax for a public purpose gives that existing municipal governmental agency, so far as it has private proprietary rights, no ground for just complaint.

Every point urged in behalf of the city of Boston has been con-

sidered with care. It is not necessary to discuss them in further detail. Treating the bill on its merits, the conclusion is that c. 159 violates no constitutional right of the city of Boston and the bill sets forth no ground for relief. The decree overruling the demurrers must be reversed and a decree entered sustaining the demurrers for want of equity.

*So ordered.*