## BOSTON ELEVATED RY. CO. v. MALLEY.

(District Court, D. Massachusetts. April, 1923.)

### No. 1670.

1. Internal revenue ⊜⇒11—Control over vessel determines whether contract of charterer is for transportation services or is a lease of vessel.

The degree of control over the vessel given the respective parties under the charter determines whether it was essentially a lease of the vessel or a contract for transportation service, and if the owner retains control the charterer has a contract for service only, and is liable to the tax imposed by Revenue Act Oct. 3, 1917, § 500 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6309⅛a), on the amount paid for transportation by water.

2. Shipping ⊜⇒41—Contract with shipping board held not to make charterer an owner, but merely liable for transportation services.

A contract between the charterer of a vessel, which had been requisitioned by the government, the Shipping Board, and the owner of the vessel, which operated it for the board, which required the owner to provide the personnel, supplies, and bunker coal, and to keep the vessel in efficient state, provided that cargo should be received and delivered within reach of the vessel's tackle, reserved space for officers, crew, and supplies, provided that the captain should prosecute his voyages with all reasonable dispatch, permitted the charterer to appoint a supercargo, and authorized the owner to substitute another steamship, reserved control over the vessel to the owner, so that the charterer did not become an owner pro hac vice, but merely paid for transportation services.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Internal revenue ☞11—Elevated railway, operated by state agents, but not owned by state, is not property of the state, under revenue statute; "services rendered to state."**

Under Sp. St. Mass. 1918, c. 159, providing for the operation by state agencies of the Boston Elevated Railway Company under the terms therein specified, which by its title and as construed by the state justices avoided public ownership of the railway, and which by section 2 reserved the right of the commonwealth or of any subdivision to tax the company or its stockholders, payments by the railway company while being so operated for the transportation of coal were not payments for services rendered to a state, which were excepted by Revenue Act Oct. 3, 1917, § 502 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6309⅛c), from the tax on payments for transportation by water levied by section 500 (section 6303⅛a) of that act, which tax was required by section 501 (section 6309⅛b) to be paid by the person paying for the services rendered.

**4. Internal revenue ☞11—Payment for transportation by railway operated by states held not for services rendered to state.**

Payments by an elevated railway company which was being operated by agents of the state, but not owned by the state for coal transported by the company, which came from the operating revenues of the corporation and not from the state funds, though they might later appear in a deficit which the state agreed to make good, are not payments by the state within the exception from the tax on payments for transportation by water.

At Law. Action by the Boston Elevated Railway Company against John F. Malley, formerly an internal revenue collector, to recover taxes paid under protest. On demurrer to the declaration. Demurrer sustained.

H. Ware Barnum, of Boston, Mass., for plaintiff.

Robert O. Harris, U. S. Atty., of Boston, Mass., and Frederic S. Harvey, Asst. U. S. Atty., of Lowell, Mass., for defendant.

PETERS, District Judge. This is an action at law, brought to recover $6,832.21, being the amount of taxes assessed against the plaintiff, collected and paid (under protest) by virtue of the Revenue Act of October 3, 1917, title 5, §§ 500–503 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 6309⅛a–6309⅛d). Section 500 (section 6309⅛a) provides "a tax equivalent to three per centum of the amount paid for the transportation by * * * water * * * of property by freight consigned from one point in the United States to another."

The defendant, a former collector of internal revenue, demurs to the plaintiff's declaration.

From the declaration it appears that by a charter party dated January 24, 1911, the plaintiff chartered the steamship Everett from the New England Coal & Coke Company for 10 years, at $15,000 per year, for carrying merchandise.

In October, 1917, the United States Shipping Board, acting under the authority of the Act of June 15, 1917, c. 29, 40 Stat. 182, requisitioned the steamship and, by an agreement entered into between the plaintiff, the New England Fuel & Transportation Company (then owner), and the Shipping Board, the plaintiff was permitted to operate the vessel in its own service for the transportation of coal from Hampton Roads and Baltimore to Boston, under terms and conditions similar

to those in the original charter from the coal and coke company, the charter hire being increased to $23,000 per month, and the transportation company was made the agent of the board to operate the steamship until she should be withdrawn from such service.

Copies of the original charter and agreement between the plaintiff, the transportation company, and the Shipping Board, attached to the plaintiff's writ, are too voluminous to be recited in full. Various important paragraphs will be referred to.

The plaintiff paid to the transportation company, as agent, various sums of money as charter hire and in addition the transportation company demanded and collected from the plaintiff 3 per cent. of such sums as a transportation tax, under the provisions of the Revenue Act, above referred to, and paid over the sum to the defendant, then collector of internal revenue for the district of Massachusetts.

On May 22, 1918, the Governor of the commonwealth of Massachusetts, approved an act of its Legislature, entitled "An act to provide for the public operation of the Boston Elevated Railway Company" (Sp. St. 1918, c. 159), and on July 1, 1918, the trustees appointed thereunder took possession for the purpose of operating said railway as provided in said act. A copy of said act is annexed to the plaintiff's declaration. Of the taxes in question, $2,125.57 were assessed subsequent to July 1, 1918.

The plaintiff claims that the taxes were illegally exacted in that the charter hire paid by it for the steamship Everett was not an amount paid for the transportation of property by freight, within the meaning of section 500 of the Revenue Act of 1917, and that in any event, as to the taxes collected after July 1, 1918, they were based on services rendered to the Commonwealth of Massachusetts and not subject to a tax.

[1] In order to pass upon the first contention of the plaintiff it is necessary to determine whether the charter under which the plaintiff was acting was essentially a lease of the vessel or a contract for service. This depends upon the degree of control over the vessel given the respective parties under the charter. If the whole control over the vessel and its navigation is given the charterer, he is doubtless the owner for the time being, has a lease of the vessel, and thus furnishes his own transportation. If, on the other hand, the owner retains control, the charterer has a contract for service only, and buys transportation of the owner.

This fundamental rule is laid down in·Leary v. U. S., 14 Wall. 607, 20 L. Ed. 756, as follows:

"If the charter party let the entire vessel to the charterer, with a transfer to him of its command and possession, and consequent control over its navigation, he will generally be considered as owner for the voyage or service stipulated; but, on the other hand, if the charter party let only the use of the vessel, the owner at the same time retaining its command and possession, and control over its navigation, the charterer is regarded as a mere contractor for a designated service, and the duties and responsibility of the owner are not changed. In the first case the charter party is a contract for the lease of the vessel; in the other it is a contract for a special service to be rendered by the owner of the vessel."

[2] By the agreement between the plaintiff, the New England Fuel & Transportation Company (the owner), and the Shipping Board under which the vessel was used during the period in question, the transportation company was authorized and directed to "operate the vessel in the service of the said railway for the transportation of coal from Hampton Roads, Va., and/or Baltimore, Maryland, to Boston." The owner provided the vessel manned, conditioned, insured, efficient, and ready for the service at all times. If the railway should have reason to be dissatisfied with the conduct of the captain or officers, the owner was to investigate and make needed changes in personnel. The vessel should work day and night, if required—the owner to provide the extra man; the railway to pay the extra expense.

The railway was to pay all water, port charges, pilotages, agencies, and commissions.

"The whole reach and burthen of the said vessel shall be at the disposal of the said railway, reserving only proper and sufficient space for officers, crew, bunker, supplies, tackle, apparel, provisions and stores."

The captain should prosecute his voyages with dispatch, render customary assistance with the crew and winches, and be "subject to the orders and directions of the railway as regards employment, agency, or other arrangements." The "railway shall indemnify the said board and its said agent * * * for any and all consequences or liabilities arising * * * from the said captain's execution of or compliance with any bill of lading."

"In the event of loss of time resulting from a deficiency of men or stores, repairs, breakdown of machinery, dry-docking, stranding, fire, or other damage, preventing the movement or operation of the said vessel for more than 24 hours, the payment of said charter hire shall cease from the beginning of the loss of time so caused, and until the said vessel again shall be in an efficient state to resume her said service: Provided, that if the said vessel be driven by stress of weather or accident to cargo into a port or anchorage, all detention or loss of time thereby incurred shall be at the risk and expense of the said railway; acts of God, public enemies, fire, restraint of governments other than the United States, and all dangers and accidents, of the seas, rivers, machinery, boilers, and navigation always mutually excepted."

In the event that the Shipping Board should withdraw the Everett from the service of the plaintiff, it agreed to furnish substitute steamers.

The charterer had the right to appoint a supercargo to be boarded at the expense of the owner.

When necessary repairs had to be made on the vessel, payment of the hire was to be suspended. The charterer had the option at any time of turning over the vessel to the owner for not more than four round trips giving 30 days' notice, and not paying for the vessel at such times.

Each party finds in this charter provisions supporting his contention; but, taking the instrument as a whole, the construction urged by the defendant that the charter is really a contract for the use, and

not a demise of the ship, is the more reasonable, does less violence to the terms of the instrument, and is the better supported by authority.

The most important provisions are consistent only with an intention on the part of the owner to retain the possession and command of the vessel, and it is well settled that the command and possession of the vessel and consequent control over its navigation must be surrendered to the charterer before he can be regarded as owner pro hac vice. Hagar v. Clark, 78 N. Y. 45; The Nicaragua (D. C.) 71 Fed. 723 (affirmed in 72 Fed. 207, 18 C. C. A. 511).

Among the provisions apparently not consistent with an intention to transfer to the charterer such jurisdiction over the vessel as would make him an owner for the time being are the following, many of which have received such a construction from courts in the past:

(1) The owner was to provide the personnel of the vessel, pay for all provisions, stores, and wages, supply bunker coal, and keep the vessel and machinery in efficient state "during the said service." This indicates that the captain and those under him were agents of the owner—further emphasized by the certain limited authority over them, given the charterer in paragraph "f" of the contract with the Shipping Board, in which it is provided that the captain "shall be subject to the orders and directions of the said railway *as regards employment, agency or other arrangements,*" thus by implication excluding the charterer from the complete control of the master of the vessel. American Steel Barge Co. v. Cargo of Coal (D. C.) 107 Fed. 964; The Volunteer, Fed. Cas. No. 16,991; Swift v. Tatner, 89 Ga. 660, 15 S. E. 842, 32 Am. St. Rep. 101.

(2) Under paragraph "d" of the charter, "cargos shall be received and delivered alongside and within reach of the vessel's tackles," etc. In Hagar v. Clark, 78 N. Y. 45, it is said of a similar provision:

"This implies the concurrence of two parties; but if the vessel was let to the defendants [charterers], if by the charter entire possession and control had been secured to them, there was no necessity for, or meaning in these covenants."

(3) Paragraph "e" provides:

"The whole reach and burthen of the said vessel shall be at the disposal of the said railway, reserving only proper and sufficient space for officers, crew, bunker supplies, tackle, apparel, furniture, provisions, and stores."

It is said of similar reservations in Hagar v. Clark, above:

"It is obvious that the defendants did not acquire the right to the whole vessel for they were to have no more of it than was necessary for the cargo, nor so much, if it did not leave room for the crew and their provisions and the ship's clothing and cables. They did not become lessees of the vessel, but freighters entitled to have their goods loaded and stored therein so far as could be done without encroaching on that portion of the vessel which was excepted."

(4) In paragraph "f" the owner agrees that the captain shall prosecute his voyages with all reasonable dispatch, thus implying, as is said in American Steel Barge Co. v. Cargo of Coal, above, that his dispatch was to be prosecuted by the owners, and that the control of the charterer over his actions was not complete.

(5) The permission to appoint a supercargo given the charterer appears to be unnecessary if the owner had surrendered control.

(6) The provision, unusual in charters, that the owner may substitute for the steamship another steamship of similar design, capacity, etc., certainly indicates that there was no intention to make a demise of the steamship Everett, and is only consistent with the theory that the intention was to furnish an opportunity of transportation to the charterer, and not a charter of any particular vessel.

Without enlarging upon the matter, it seems clear, from an analysis of the charter and upon weighing and contrasting the rights given and the rights reserved, that the charterer was given the right to the transportation of coal from Hampton Roads or Baltimore to Boston in this or in some other vessel that the owner might furnish, and that the owner did not give up the possession and command of the vessel to the extent of making the charterer owner pro hac vice, and that the charter hire paid the owner as the agent of the Shipping Board was really and in substance money paid for the "transportation by water of property by freight," which is taxable under the Act of Congress referred to.

The second proposition of the plaintiff is that, even if the payments of charter hire after July 1, 1918, would be otherwise taxable, the services paid for were rendered to the Commonwealth of Massachusetts, and thus exempt from taxation.

Section 502 of the Revenue Act of 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6309⅛c) provides that:

"No tax shall be imposed under section five hundred upon any payment received for services rendered to the United States, or any state, territory, or the District of Columbia."

[3] It is claimed that Special Statutes of Massachusetts of 1918, chapter 159, after acceptance by the Railway Company, constituted in substance a lease to the commonwealth of the Boston Elevated Railway, and that consequently the transportation furnished on the steamer Everett for which payment was made and taxed as transportation by freight under section 500, was really furnished the commonwealth of Massachusetts and not taxable.

Prior to the taking effect of the special act above referred to, the plaintiff was a public service corporation and subject to the tax. What took place on July 1, 1918, which so radically changed its status? Did it become so intimately attached to the commonwealth of Massachusetts that taxing it is taxing a state in its sovereign capacity?

Apparently that was not the view of the Legislature of Massachusetts, which, in section 2 of the act referred to, took care to provide that nothing therein contained should be held to affect the right of the Commonwealth or of any subdivision thereof to tax the company or its stockholders in the same manner and to the same extent as if the company had continued to manage and operate its own property.

While federal taxation is not specially mentioned, the fact that the Legislature expressly stated that the company should continue to be subject to taxation is strong indication that the Legislature intended that the company should be subject to all the obligations to which it

was subject before it was placed under the control of trustees appointed by the Commonwealth.  ·

It is not profitable to discuss whether the term "lease" is properly descriptive of the legislative contract.  Probably no one word can be used to accurately characterize it.  It would seem that the relation of the state savors more of guardianship than of ownership.  It is in substance an arrangement whereby the state takes over the operation of the railway property and agrees to carry it on according to a specific plan which contemplates financial assistance from the state when necessary, with an eventual spreading of the cost of the service, as defined in the act, over the users thereof.  Public ownership is carefully avoided.  Public operation is definitely provided for.

This act has been construed by the Supreme Judicial Court of Massachusetts, and the theory of public ownership expressly denied.

In the Opinion of the Justices, reported in 231 Mass. 603, 122 N. E. 763, it is said:

"The chief design of that act was to provide by public operation for fares at rates sufficient to meet all costs of furnishing the service."

"In paragraph 11 provision was made for the advancement of moneys by the commonwealth (to be assessed upon the cities and towns enjoying the service) to maintain the reserve fund.  But that was rather an incidental provision to tide over the affairs of the company until the fundamental idea of rates adequate to meet the cost of the service could be established and the habits of the traveling public could become adjusted thereto."

Again in Boston v. Treasurer, etc., 237 Mass. 403, 103 N. E. 390, the court says, speaking of this act:

"Its general scope is indicated by its title, which is 'An act to provide for the public operation of the Boston Elevated Railway Company.'  The accuracy of the title is confirmed by the substance of the act throughout.  Its purpose is operation through public officers, and not public ownership."

"The main design of the act is public operation of the railway company at such rates of fare to be fixed by the trustees from time to time as shall afford revenue sufficient to defray all charges and the dividends established by the act."

"The effect of the act, when accepted, as it has been, was in its essential features a lease of the railway property to the commonwealth, or at least a contract for public operation upon stipulated terms."

The commonwealth did not assert ownership of the properties of the railway company.  The compensation of the trustees was to be paid by the railway company.  The trustees were operating agents, not public officers.  (Section 1.)  They were agents of the company, and not of the commonwealth.  (Section 2.)

It seems clear that the railway is neither the temporary property nor an adjunct of the Commonwealth, and consequently transportation of coal for the use of the railway company can by no possibility be recorded as services rendered the state.

[4] Whose money paid for the transportation which is the subject of the tax?  Did the trustees, who were by the statute agents of the company and not public officers, pay the money from the treasury of the company, or did they receive it from the Commonwealth?  It is not claimed that it came from the treasury of the Commonwealth, but that, at most, at the end of the period of public operation, on account

of having been paid, it might become part of a deficiency which would be met by the Commonwealth.

We are not concerned, however, with the accounting or with the payments at the end of the period. It is the present payment when made that is the subject of the tax. Wherever there is a *payment* for transportation the tax of 3 per cent. attaches, unless the payment is for transportation services rendered a state and paid for by a state.

Section 501 of the act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6309⅛b) provides that the "taxes * . * * shall be paid by the person or corporation * * * paying for the service or facilities rendered." It is clear that the payment for the transportation in this case was made by the railway company, and it is the "payment" that is made taxable by the statute.

The exception refers to payments made by a state:

"No tax shall be imposed upon any *payment received* for services rendered * * * any state."

This contemplates a disbursement by a state in its sovereign capacity —a payment made at the time for transportation services rendered. The fact that the state may be then or thereafter lending or giving money to the corporation does not change the liability for the tax.

The Legislature left the corporation a separate entity, operated, to be sure, under state supervision and with an agreement to lend assistance, but subject to all liabilities as before. As soon as the railway company paid the money for transportation this tax became one of its liabilities, and the result is that the demurrer must be sustained.