HELVERING, COMMISSIONER OF INTERNAL REVENUE, *v.* POWERS, EXECUTOR, ET AL.

No. 17.   Argued October 12, 15, 1934.—Decided December 3, 1934.

*Solicitor General Biggs,* with whom *Assistant Attorney General Wideman* and *Messrs. Erwin N. Griswold, James W. Morris,* and *John MacC. Hudson* were on the brief, for petitioner.

*Mr. Melville Fuller Weston,* with whom *Mr. J. Colby Bassett* was on the brief, for respondents.

Mr. Chief Justice Hughes delivered the opinion of the Court.

The question presented is whether the compensation of the members of the Board of Trustees of the Boston Elevated Railway Company is constitutionally exempt from the imposition of a federal income tax. Immunity is sought upon the ground that the trustees are officers of the Commonwealth of Massachusetts and instrumentalities of its government. The Circuit Court of Appeals, reversing the decision of the Board of Tax Appeals, held in favor of the exemption. 26 B. T. A. 1381; 68 F. (2d) 634. We granted a writ of certiorari. 292 U. S. 620.

Chapter 159 of the Massachusetts Special Acts, 1918, provides for the public operation of the Boston Elevated Railway Company. The Act creates a board of five trustees, to be appointed by the Governor, with the advice and consent of the Council, for the term of ten years. The Act provides that the trustees shall be sworn before entering upon their duties; they shall own no stock or other securities of the Company and shall each receive from the Company $5,000 annually as compensation for his services. They are subject to removal by the Governor with the advice and consent of the Council.

The trustees are charged with the duty of managing and operating the Company and its properties for the period, as stated or extended, of public operation, and to that end are to have "possession of said properties in be-

half of the Commonwealth." Except as otherwise stated, they are to exercise all the powers of the Company, being empowered in their discretion to appoint and remove the president and other officers of the Company, except the directors. The trustees are authorized " to regulate and fix fares " and " to determine the character and extent of the service and facilities to be furnished." Their authority for this purpose is made " exclusive " and is not " subject to the approval, control or direction of any other state board or commission." The Act provides that the trustees and their employees shall be deemed to be acting as agents of the Company and not of the Commonwealth, and that the Company shall be liable for their acts and negligence to the same extent as if they were in the immediate employ of the Company, but that the trustees shall not be personally liable.

The Company was required, on or before its acceptance of the Act, to raise a stated amount by the issue of preferred stock in order to provide for the improvement of the property of the Company and the establishment of a reserve fund. The trustees are to fix such rates of fare as will reasonably insure sufficient income to meet the cost of service, as defined, which, in addition to operating expenditures, outlays for the required upkeep of the properties, and other amounts chargeable against income and surplus, includes fixed dividends on the preferred stock and dividends on the common stock at specified rates. Surplus income is to be transferred to the reserve fund and that fund is to be used to meet deficiencies. If it is insufficient for that purpose, the trustees are required to notify the treasurer and receiver general of the Commonwealth, and the Commonwealth is to pay the amount of the deficit ascertained according to the Act. Amounts thus paid are to be assessed upon the several cities and towns in which the Company operates. Provision is

222

made for reimbursement out of subsequent surplus income. The Act contemplates the maintenance of the property in good operating condition and the restoration of the reserve fund, if depleted, to its original amount on the expiration of the period of public management. At that time the control of the property is to revert to the Company. It may then collect such reasonable fares as will produce an income sufficient to pay the reasonable cost of the service as defined in the Act, including specified dividends on the common stock, and the Company is then to be subject to public regulation in such manner as may be determined by the General Court, but not so as to reduce the income below the cost of the service as stated.

The tax in question was on the compensation received by the trustees for the years 1926 to 1929. It appears that in 1919 the Commonwealth paid to the Company nearly $4,000,000 as a deficiency resulting from the public operation, and that in subsequent years, up to and including 1929, the income received was not sufficient for full reimbursement.

The validity of the statute has been sustained as one enacted for a public purpose and providing for the management of the enterprise by the Commonwealth. *Boston* v. *Treasurer & Receiver General,* 237 Mass. 403, 413, 420; 130 N. E. 390; *Boston* v. *Jackson,* 260 U. S. 309, 314, 316. The Supreme Judicial Court of Massachusetts has characterized the " public operation " as " undertaken by the Commonwealth, not as a source of profit, but solely for the general welfare." *Boston* v. *Treasurer & Receiver General, supra.* The trustees are the administrative agents of the Commonwealth in this enterprise, and we may assume, as the Circuit Court of Appeals has held, that the trustees come within the general category of " public officers " by virtue of their appointment by the

Governor, with the advice and consent of the Council, and their tenure and duties fixed by law.[1]   *United States* v. *Hartwell*, 6 Wall. 385, 393; *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514, 520.   See *Opinion of the Justices*, 261 Mass., pp. 542, 543, 550; 159 N. E. 55.

While the undertaking is for the public benefit, it is still a particular business enterprise—the operation of a street railway—and the functions of the trustees are limited accordingly.   The property remains in private ownership.   The Act, accepted by the Company, constitutes in substance an agreement between the Company and the Commonwealth that the latter shall temporarily take over the management and operation and pay specified amounts by way of compensation.   While the Commonwealth may be called upon to bear losses that may occur, if the fares as fixed prove to be insufficient, the operation by the trustees is intended to be self-sustaining. The transportation service is to be rendered, as respondents' counsel say, " under such a flexible system of rate-making as would allow the fixing of fares equal, as nearly as might be, to the cost of service."   The compensation of the trustees is undoubtedly a part of that cost.   " The main design of the Act," as stated by the Supreme Judicial Court, " is public operation of the railway company at such rates of fare to be fixed by the trustees from time to time as shall afford revenue sufficient to defray all charges and the dividends established by the act."   *Boston* v. *Treasurer & Receiver General, supra.*   The authority given to the trustees " to regulate and fix fares," and

---

[1] The provision of § 1 of Chapter 159 of the Massachusetts Special Acts of 1918 that the trustees shall not be considered public officers within the meaning of § 25 of Chapter 514 of the Acts of 1909, and that § 1 of Chapter 7 of the Revised Laws shall not apply to the trustees, creates special limitations of such a nature as not to derogate from their general status. See *Opinion of the Justices*, 261 Mass., p. 543; 159 N. E. 55.

224

the further authority to ascertain such losses as may be incurred, which are to be borne by the Commonwealth, are both incident to that main purpose.

The immunity sought by the trustees from payment of the federal income tax has not been granted by the Congress. The definitions of income in the federal income tax acts cover income derived " from compensation for personal service . . . of whatever kind and in whatever form paid." Revenue Acts of 1926, §§ 212 (a), 213 (a); 1928, §§ 21, 22 (a). This language is certainly broad enough to embrace the compensation of the trustees, and the immunity, if it exists, must rest upon constitutional limitation. The Treasury Regulations, manifestly in an effort to interpret and apply that limitation, provide for exemption from taxation of compensation paid by a State or political subdivision to its officers and employees only in case their services are rendered " in connection with the exercise of an essential governmental function." Treas. Reg. No. 69, Art. 88; No. 74, Art. 643; No. 77, Art. 643. But the Treasury Department could not by its regulation either limit the provisions of the statute or define the boundaries of their constitutional application.

We come then to the question whether the Congress has the constitutional power to impose an income tax upon the compensation of public officers of the character here involved. We do not regard that question as answered by mere terminology. The roots of the constitutional restriction strike deeper than that. The term " public office " undoubtedly implies a definite assignment of public activity, fixed by appointment, tenure and duties. But whether that field of activity, in relation to a State, carries immunity from federal taxation is a question which compels consideration of the nature of the activity, apart from the mere creation of offices for conducting it, and of the fundamental reason for denying

federal authority to tax. That reason, as we have frequently said, is found in the necessary protection of the independence of the national and state governments within their respective spheres under our constitutional system. *Collector* v. *Day,* 11 Wall. 113, 125, 127; *Ambrosini* v. *United States,* 187 U. S. 1, 7; *Indian Motocycle Co.* v. *United States,* 283 U. S. 570, 575. The principle of immunity thus has inherent limitations. *Metcalf & Eddy* v. *Mitchell, supra,* pp. 522–524; *Willcuts* v. *Bunn,* 282 U. S. 216, 225, 226; *Indian Motocycle Co.* v. *United States, supra,* p. 576; *Fox Film Corp.* v. *Doyal,* 286 U. S. 123, 128; *Board of Trustees* v. *United States,* 289 U. S. 48, 59. And one of these limitations is that the State cannot withdraw sources of revenue from the federal taxing power by engaging in businesses which constitute a departure from usual governmental functions and to which, by reason of their nature, the federal taxing power would normally extend. The fact that the State has power to undertake such enterprises, and that they are undertaken for what the State conceives to be the public benefit, does not establish immunity. *South Carolina* v. *United States,* 199 U. S. 437; *Flint* v. *Stone Tracy Co.,* 220 U. S. 107, 172; *Murray* v. *Wilson Distilling Co.,* 213 U. S. 151, 173; *Metcalf & Eddy* v. *Mitchell, supra; Indian Motocycle Co.* v. *United States, supra; Ohio* v. *Helvering,* 292 U. S. 360, 368, 369. The necessary protection of the independence of the state government is not deemed to go so far.

In *South Carolina* v. *United States, supra,* the State undertook to establish a monopoly of the sale of intoxicating liquors and prohibited the sale except by dispensaries to be operated by the State. The dispensers had no interest in the sales and received no profit from them. The question was whether the dispensers were relieved from liability for the internal revenue tax prescribed by the Congress for dealers in intoxicating liquors because the

dispensers were agents of the State, which in the exercise of its sovereign power had taken charge of the business. While the court recognized the power of the State to undertake the enterprise, the exemption was denied, as the State could not, by engaging in a business of that sort, withdraw it from the taxing power which the Constitution vested in the national government. *Murray* v. *Wilson Distilling Co., supra.*

The Court reached a similar conclusion in the recent case of *Ohio* v. *Helvering, supra,* where the State had established a department of liquor control and sought an injunction to restrain the enforcement of federal statutes imposing taxes upon dealers in intoxicating liquors. The State sought to distinguish the case of South Carolina because, in Ohio, " the state-owned stores " were operated by civil service employees of the state government, and hence the question was said to concern the taxation of the State itself. The argument was unavailing and the Court rested its ruling upon the broad ground that when the State becomes a dealer in intoxicating liquors it falls within the reach of the tax as one validly imposed by the federal statute.

The method which the State may adopt in organizing such an activity cannot be regarded as determinative. If the dealers in South Carolina, or those employed to operate the state stores in Ohio, had been denominated public officers, and as such had been assigned definite tenure and duties, the same result would have been reached, as the principle involved would be equally applicable. Nor, in such a case, would the fact that the officers were entrusted with the authority to fix prices for the sales under their charge in a manner appropriately to secure the revenue needed for the enterprise, or were charged with the duty of ascertaining the losses which, if they occurred, were to be borne by general taxation, establish a material distinction.

The nature of the enterprise, and not the particular incidents of its management, would control.

We see no reason for putting the operation of a street railway in a different category from the sale of liquors. In each case, the State, with its own conception of public advantage, is undertaking a business enterprise of a sort that is normally within the reach of the federal taxing power and is distinct from the usual governmental functions that are immune from federal taxation in order to safeguard the necessary independence of the State. If, in the instant case, the Commonwealth had acquired the property of the Company and had organized management of it in perpetuity by the state government, instead of temporarily, or had taken over all the street railways in all its cities for direct operation by the Commonwealth, there would appear to be no ground, under the principles established by the decisions we have cited, for holding that this would effect the withdrawal of the enterprise from the federal taxing power. And the fact that the State has here undertaken public management and operation for a limited time, and under the particular restrictions of the agreement with the Company, cannot be said to furnish a ground for immunity.

If the business itself, by reason of its character, is not immune, although undertaken by the State, from a federal excise tax upon its operations, upon what ground can it be said that the compensation of those who conduct the enterprise for the State is exempt from a federal income tax? Their compensation, whether paid out of the returns from the business or otherwise, can have no quality, so far as the federal taxing power is concerned, superior to that of the enterprise in which the compensated service is rendered.

We conclude that the Congress had the constitutional authority to lay the tax.

*Decree reversed.*