ABAD et al. v. PUERTO RICO COMMUNICATIONS AUTHORITY.

CUEVAS et al. v. PUERTO RICO COMMUNICATIONS AUTHORITY.

Civ. Nos. 5059, 5080.

United States District Court
D. Puerto Rico, San Juan Division.
Jan. 21, 1950.

Santiago de la Fuente and Hipolito Marcano, San Juan, Puerto Rico, for plaintiffs.

James E. Curry, San Juan, Puerto Rico, for defendant.

CHAVEZ, District Judge.

This is an action against the Puerto Rico Communications Authority to recover unpaid minimum wages, overtime compensation, liquidated damages and attor-

ney's fees, under Section 16(b) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. Plaintiffs are workers employed in the operation, service, repair and maintenance of the defendant telephone and telegraphic system.

Defendant has moved to dismiss the complaint upon the ground that the complaint fails to state a claim upon which relief can be granted in that defendant is a political subdivision of the territory of Puerto Rico and, therefore, exempt under Title 29 U.S.C.A. § 203(d), which provides as follows: "Sec. 203(d). 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee but shall not include the United States or any State or political subdivision of a State, * * *."

Section 203(c) provides: " 'State' means any State of the United States or the District of Columbia or any Territory or possession of the United States."

The Puerto Rico Communications Authority was created by Legislative Act No. 212 approved May 12, 1942. Laws of Puerto Rico 1942, Page 1064–1106. The title to the Act creating the Puerto Rico Communications Authority provides: "An Act creating the Puerto Rico Communications Authority: defining its status and providing for its powers and duties; transferring to it all the properties, rights, duties, and obligations of the Insular Telegraph and Telephone; authorizing it to acquire, construct, maintain, operate, improve, and extend revenue-producing undertakings to continue the development of communications facilities in, to, and from the Island; providing for the appointment and status of its officers and employees and for the management of the funds of the authority, and for the procurement of property and services for the authority; providing for the fixing and collecting of rates, fees, and other charges for the services of such undertakings and for the segregating or combining and the pledging, charging and otherwise encumbering of the revenues thereof;"

Section 2(g) of the Puerto Rico Communications Authority Act provides: "The term 'Insular Telegraph' shall mean all the works and property forming the telegraphic and telephonic communications system belonging to and operated by The People of Puerto Rico and all of the stations, lines, offices, equipment and other facilities or property used or available for use in connection with the operation of said system."

Section 3 constitutes the Governor, the Commissioner of Agriculture and Commerce and the Commissioner of the Interior into a "body corporate and politic", constituting a public corporation and governmental instrumentality of the People of Puerto Rico by the name of the Puerto Rico Communications Authority.

Section 3(b) reiterates that the Authority shall be a governmental instrumentality, subject to control by the officers mentioned in Section 3 acting in their capacity as Members thereof but it is a corporation having legal existence and personality separate and apart from that of the government and those of the officers so controlling it. The debts of the Communications Authority are expressly made its own and not of the Insular Government.

Section 4 provides that the powers of the Authority shall be exercised by a Board of Directors consisting of five Members acting as a board. It provides for their appointment, term of office and authorizes them to appoint a General Manager of the Authority and a Secretary.

Section 5 provides that the General Manager shall be appointed by the Board exclusively upon the basis of merit as determined by technical training, skill, experience, and other qualifications best suited to carrying out the purposes of the Authority.

Section 6 provides that the purposes of the Authority shall be to develop and improve, own, operate and manage any and all types of communications facilities and services in, to and from the Island of Puerto Rico and to make available the benefits thereof in the widest economic manner, thereby promoting the general welfare and increasing commerce and prosperity. The Communications Authority is given

the usual corporate powers of perpetual existence, adoption of a seal, etc.

Section 6(e) grants the Communications Authority the right to sue and be sued. By other provisions in Section 6 the Communications Authority is granted the right to acquire property, fix rates, borrow money, but without pledging the credit or taxing power of Puerto Rico or any of its political subdivisions.

Section 7 provides that employees who have, prior to the establishment of the Communications Authority, been entitled to retirement benefits under the Civil Service Law of Puerto Rico, shall continue to enjoy said rights.

Section 7(b) provides that no person shall hold office as a member, director, officer, employee or agent of the Authority who has a direct or indirect financial interest in a privately owned enterprise engaged in the communications business or any business whose primary activities are auxiliary thereto.

Section 8 transfers the Insular Telegraph to the Communications Authority.

Section 10 prohibits any action by the Communications Authority impairing the obligation of any contracts assumed by the People of Puerto Rico under authority of existing law.

Section 12 provides that all monies of the Authority shall be deposited in depositories of the Insular Government but kept in a separate account or accounts in the name of the Authority. The accounting system is to be set up by the Auditor of Puerto Rico who shall audit the books of the Authority.

Section 13 provides that the People of Puerto Rico may institute condemnation proceedings in the Communications Authority's behalf.

By Section 14 all municipalities and political subdivisions of Puerto Rico are authorized to grant and convey to the Authority, upon its request and upon reasonable terms and conditions, any property or interest therein, which the Authority may deem necessary or convenient to effectuate the purposes of the Authority.

By Section 16 the Puerto Rico Communications Authority may issue bonds not in excess of $5,000,000.00.

Section 17 makes the Communications Authority subject to receivership upon default in the payment of principal and interest or in the payment of interest only at maturity or upon call for redemption, and such default shall continue for a period of 30 days.

Section 19 provides that the Communications Authority shall submit to the Legislature and to the Governor of Puerto Rico, as soon as practicable after the close of each fiscal year of the Insular Government but prior to the end of the calendar year a financial statement and complete report of the business of the Authority for the preceding fiscal year, and a complete report on the status and progress of all its undertakings and activities since the creation of the Authority or the date of its last such report.

Section 20 provides that the People of Puerto Rico and its political subdivisions are not liable on bonds issued by the Authority.

Section 22(a) provides: "It is hereby found and declared that the purposes for which the Authority is created and shall exercise its powers are the promotion of the general welfare and the increase of commerce and prosperity, and are all public purposes in all respects for the benefit of the People of Puerto Rico and that, therefore, the Authority shall not be required to pay any taxes or assessments on any of the property acquired by it or under its jurisdiction, etc."

Section 22(c) provides that the bonds issued by the Authority shall be exempt from taxation.

By Section 23 all works, projects, and property of the Authority are hereby declared to be of public utility.

By Section 24 the Insular Government pledges and agrees not to alter or limit the rights of powers of the Authority until all bonds together with interest are fully met and discharged.

Thus it is clear that the Puerto Rico Communications Authority was created to

take over the properties, rights, duties and obligations of the Insular Telegraph and Telephone system and to continue the development of communication facilities in, to and from the Island of Puerto Rico.

It should be remembered that the military control of civil affairs in Puerto Rico began with the landing of the Army of the United States on July 25, 1898 and included the whole Island on October 18, 1898.

General Orders No. 116, Headquarters, Department of Puerto Rico, San Juan, August 12, 1899, by command of Brigadier General Davis which purported to simplify administration of the various insular offices provided by Paragraph (10) thereof as follows:

"10. The other branches of the public service not heretofore mentioned in this order are as follows—all reporting directly to the Military Governor:
  "(a) The Treasury
  "(b) The Auditor
  "(c) The Judicial Boards
  "(d) The Board of Prison Control
  "(e) The Insular Police
  "(f) The Postal Service
  "(g) The Telegraph Service
  "(h) The Quarantine Service of Ports
  "(i) The Superior Board of Health
  "(j) The Inspector of Lights and Buoys
  "(k) The U. S. Provisional Court."
Military Orders, Commanding General, Department of Puerto Rico, from October 18, 1898 to April 30, 1900.

The military control of civil affairs came to a conclusion on May 1, 1900 when Hon. Charles H. Allen was inaugurated as the first civil Governor of Puerto Rico. General Orders and Circular, Headquarters, Department of Puerto Rico, January 1 to April 30, 1900, Circular No. 21.

Under the Treaty of Paris proclaimed on April 11, 1899, 30 Stat. 1754, the Government of Spain ceded Puerto Rico to the United States, Article 2. By Article VIII of said Treaty all buildings, wharves, barracks, ports, structures, public highways and other immovable property belonging to the Crown of Spain were ceded to the United States.

Under Section 7 of the Organic Act, approved April 12, 1900, 48 U.S.C.A. § 733, Puerto Rico was constituted a body politic under the name of The People of Puerto Rico.

Section 13 of the Organic Act, 48 U.S.C.A. § 747 note, provided as follows: "Sec. 13.—That all property which may have been acquired in Porto Rico by the United States under the cession of Spain in said treaty of peace in any public bridges, road houses, water powers, highways, unnavigable streams, and the beds thereof, subterranean waters, mines, or minerals under the surface of private lands, and all property which at the time of the cession belonged, under the laws of Spain then in force, to the various harborworks boards of Porto Rico, and all the harbor shores, docks, slips, and reclaimed lands, but not including harbor areas or navigable waters, is hereby placed under the control of the government established by this Act to be administered for the benefit of the people of Porto Rico; and the legislative assembly hereby created shall have authority, subject to the limitations imposed upon all its acts, to legislate with respect to all such matters as it may deem advisable."

Section 18 of the Organic Act, 31 Stat. 81, created an Executive Council and included a Commissioner of the Interior.

Chapter VI, Sec. 133, Political Code, Revised Statutes and Codes of Puerto Rico 1902, on page 529, provides as follows:

"The Commissioner of the Interior. Sec. 133. The Commissioner of the Interior shall superintend all Insular public works, and shall have charge of all Insular property, including public buildings, public highways and bridges, water powers, unnavigable streams and the beds thereof, subterranean waters, mines or minerals under the surface of private lands, public grounds and public lands, the Insular telegraph system, public records and archives, and all the harbor shores, docks, slips and reclaimed lands."

"Sec. 134. The Department of the Interior shall be as follows: The office of Commissioner, and the following divisions,

each division to be in charge of a chief. * * *

"4. A chief of Insular Telegraph, which shall have charge of the construction, extension, maintenance and operation of the public telegraph system."

The Act of March 14, 1907, Rev.St. and Codes of Puerto Rico, 1913, § 2368 et seq., authorized the Commissioner of the Interior to provide for the extension of the Insular Telegraph system by the construction, maintenance and operation of a system of long-distance and local telephone lines. This telegraph system was to include a long-distance telephone line between San Juan and Ponce and to establish a local telephone exchange in towns between San Juan and Ponce, or in towns of the Island which were not covered by any existing telephone franchise.

According to the report of the Commissioner of the Interior to the Governor of Puerto Rico, 1919, the first telegraph line of 95 kilometers was constructed in Puerto Rico between San Juan and Arecibo, the cost of which was estimated at 7,850 pesos of which the Treasury paid only 2,750 pesos and the remainder was covered by popular subscription. In December 1869 this line was completed thus connecting the towns of San Juan, Rio Piedras and Arecibo. After the completion of this line between San Juan and Arecibo, the extension of construction of other lines was proceeded with in accordance with the general plan projected, which consisted of uniting San Juan with the heads of the seven departments in which the Island had been divided by means of a line from San Juan to Mayaguez via Arecibo and another from San Juan to Ponce via Guayama. In May 1870 the construction planned was nearly all completed except for the branch from San German to Ponce, but an additional branch had been completed from Caguas to Humacao, which was not included in the general plan. In 1874 (January) the telegraph line from San Juan to Ponce via Mayaguez was completed.

In 1896 when the American troops arrived in Puerto Rico the telegraph service extended to practically all towns of the island, connecting with 41 offices and with a total of 1,240.5 kilometers of lines, divided into four districts, Ponce, San Juan, Mayaguez and Humacao, all under a "Director of Communications" with general offices in San Juan.

Upon the occupation of the island in 1898 by the American troops, the "United States Signal Corps" took over the telegraph service, organizing it under the Military Service.

In February 1901, as a result of an order from the War Department, the telegraph system was transferred to the Insular Government, and attached to the Department of the Interior with the title of "Bureau of Insular Telegraphs". The Insular Government in 1916 proceeded to open new offices, extending lines, including telephone circuits, having 51 offices, 14 with telegraph equipment, 14 with telephone equipment and 23 with both telegraph and telephone equipment. It also provided telegraph service in 20 offices of the Telephone Company, and it operated a heliograph communication service with Ceiba and Vieques.

The report of the Commissioner of the Interior from which the above data is quoted sets out the various bureaus and departments within the Secretary of the Interior's department. Among these is listed the Bureau of Insular Telegraph.

In South Carolina v. United States, 1905, 199 U.S. 437, 26 S.Ct. 110, 117, 50 L.Ed. 261, 4 Ann.Cas. 437, the State of South Carolina had established dispensaries for the wholesale and retail sale of liquor and prohibited sale by other than the dispensers. The United States demanded the license taxes prescribed by the internal revenue act for dealers in intoxicating liquors. The State paid the taxes. On April 14, 1901, a formal protest by the state dispensary commissioner was filed with the United States Collector of Internal Revenue at Columbia, South Carolina. The dispensers had no interest in the sales and received no profit therefrom. The entire profits were appropriated by the State and in the year 1901 the profits arising from these sales amounted to $545,248.12. Actions were commenced in the Court of Claims by the State of

South Carolina to recover the amounts paid for these license taxes and upon an adverse judgment, South Carolina appealed to the Supreme Court. The Court held in an opinion by Mr. Justice Brewer that "it is reasonable to hold that while the former (the National Government) may do nothing by taxation in any form to prevent the full discharge by the latter (State) of its governmental functions, yet, whenever a state engages in a business which is of a private nature, that business is not withdrawn from the taxing power of the nation."

Creekmore v. Public Belt Railroad Commission, 5 Cir., 1943, 134 F.2d 576, 577, certiorari denied 320 U.S. 742, 64 S.Ct. 43, 88 L.Ed. 440, was a suit under the Fair Labor Standards Act wherein five railway maintenance employees sought to recover additional compensation, liquidated damages and attorney's fees.

The City of New Orleans and the Public Belt Railroad Commission for the City of New Orleans moved to dismiss the complaint for failure to state a claim upon which relief could be granted. The District Court dismissed the complaint holding that the City of New Orleans was a political subdivision of the State of Louisiana; that the Public Belt Railroad Commission is a department of the City; and that the employer-employee relationship involved was within the exclusion of Section 3(d) of the Fair Labor Standards Act. The Circuit Court affirmed the District Court saying: "The City of New Orleans being a political subdivision of the State of Louisiana, and the Public Belt Railroad Commission being one of its duly authorized, functioning departments, we think it clear that the employer-employee-relationship between these employees and the City and its Commission falls squarely within the language of Section 3(d) which in defining 'employer' excludes 'any State or political subdivision of a State.'"

In the Creekmore case the Administrator of the Wage and Hour Division, U. S. Department of Labor, had expressed an opinion by letter dated July 10, 1939 stating that: "If the Public Belt Railroad System is wholly owned and controlled by the City of New Orleans a political subdivision of the State of Louisiana, through the Public Belt Railroad Commission for the City of New Orleans, it is our opinion that the employees of the Public Belt Railroad System are not subject to the Act by reason of the provision quoted above contained in Section 3(d)."

In Commissioner of Internal Revenue v. Shamberg's Estate, 2 Cir., 1944, 144 F. 2d 998, 1004, certiorari denied 1945,[1] involving deficiencies in income taxes assessed against Alexander J. Shamberg by the Commissioner of Internal Revenue for the years 1937 and 1938. The Tax Court determined that there were no deficiencies and the Commissioner filed petition to review the Tax Court's decision.

The question presented was whether the interest received by Shamberg in the years 1937 and 1938 on bonds of the Port of New York Authority was subject to income taxes. The Court held that the income from the bonds was exempt from taxes under the provisions of Sec. 22(b) (4) (A) of the Revenue Act of 1936 and the corresponding section, identical in form, of the Revenue Act of 1938, 26 U.S. C.A.Int.Rev.Acts, pages 825 and 1008.

The statutory provisions and the Treasury Regulations interpreting them are as follows:

" § 22.    Gross Income

"(a) General Definition. 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *

"(b) Exclusions from Gross Income. The following items shall not be included

I.   323 U.S. 792, 65 S.Ct. 433, 89 L.Ed. 631.

in gross income and shall be exempt from taxation under this title:

\* \* \* \* \* \*

"(4) Tax-free interest. Interest upon (A) the obligations of a State, territory, or any political subdivision thereof, or the District of Columbia."

Treasury Regulations 94, promulgated under the Revenue Act of 1936: "Art 22 (b) (4)-1. Interest upon State obligations. Interest upon the obligations of a State, Territory or any political subdivision thereof, or the District of Columbia is exempt from the income tax. Obligations issued by or on behalf of the State or Territory or a duly organized political subdivision acting by constituted authorities empowered to issue such obligations, are the obligations of a State or Territory or a political subdivision thereof. Special tax bills issued for special benefits to property, if such tax bills are legally collectible only from owners of the property benefited, are not the obligations of a State, Territory, or political subdivision. The term 'political subdivision within the meaning of the exemption denotes any division of the State or territory which is a municipal corporation, or to which has been delegated the right to exercise part of the sovereign power of the State or Territory. As thus defined, a political subdivision or a State or Territory may, for the purpose of exemption, include special assessment districts so created, such as road, water, sewer, gas, light, reclamation, drainage, irrigation, levee, school, harbor, port improvement and similar districts and division of a State or Territory."

The provisions of the foregoing Article of Regulations 94 were amended in Treasury Regulations 101, promulgated under the Revenue Act of 1938 so that the words "or may not" follow the word "may" in the last sentence.

The Court held that:

"The term 'political subdivision' is broad and comprehensive and denotes any division of the State made by the proper authorities thereof, acting within their constitutional powers, for the purpose of carrying out a portion of those functions of the State which by long usage and the inherent necessities of government have always been regarded as public. The words 'political' and 'public' are synonymous in this connection. (Dillon Municipal Corporations, 5th ed., sec. 34.) It is not necessary that such legally constituted 'division' should exercise all the functions of the State of this character. It is sufficient if it be authorized to exercise a portion of them. \* \* \*

"The purposes to which you refer, namely, the improvement of streets and public highways, the provision of sewerage, gas, and lights, the reclamation, drainage, and irrigation of considerable districts of land, are clearly public and have always been so treated."

Commissioner of Internal Revenue v. White's Estate, 2 Cir., 1944, 144 F.2d 1019, certiorari denied 1945,[2] is the companion case of Commissioner of Internal Rev. v. Shamberg's Estate, 2 Cir., 144 F.2d 998. The Court held that the Triborough Bridge Authority created by statute as a body corporate and politic and as a public benefit corporation, is a "political subdivision" of the State of New York within Revenue Act provision excluding from gross income interest on obligations of a state or political subdivision thereof and interest received by taxpayers on bonds of Authority is not subject to income tax notwithstanding the bonds are obligations of the Authority only and not of the City of New York, which originally commenced certain projects taken over by the Authority.

South Carolina v. United States, 199 U. S. 437, 26 S.Ct. 110, 50 L.Ed. 261, 4 Ann. Cas. 437, Helvering v. Powers, 293 U.S. 214, 55 S.Ct. 171, 79 L.Ed. 291, Ohio v. Helvering, 292 U.S. 360, 54 S.Ct. 725, 78 L.Ed. 1307, Helvering v. Gerhardt, 304 U. S. 405, 58 S.Ct. 969, 82 L.Ed. 1427, were all tax cases decided upon broad constitutional principles involving the limitations on the principle of immunity, one of said limitations being that the State cannot withdraw sources of revenue from the federal taxing power by engaging in business-

2. 323 U.S. 792, 65 S.Ct. 433, 89 L.Ed. 632.

es which constitute a departure from usual governmental functions and to which by reason of their nature, the federal taxing power would normally extend. Helvering v. Powers, supra. The immunities sought in the above tax cases were not based upon a specific Act of Congress granting immunity.

In the case at bar, the Congress has seen fit to exclude from the provisions of the Fair Labor Standards Act employees of "any State or political subdivision of a State." Therefore, the question for decision in the case at bar is not whether the state agency is engaged in a private or governmental function, but whether the plaintiffs are employees of a political subdivision of a State.

The Court, in Commissioner of Internal Rev. v. Shamberg's Estate, supra, in discussing the South Carolina case, said as follows [144 F.2d 1005]: "But even assuming the government's interpretation of the exemption provision as merely enacting the constitutional doctrine as of 1913, we do not think that the South Carolina case would permit taxation of such a state agency as the Port Authority. That decision related only to the power of the government to impose the usual license taxes upon dispensaries established by the state for the wholesale and retail sale of liquor. It held that such a state agency was subject to the tax, and that the constitutional limitation did not extend to instrumentalities used by the state in carrying on an ordinary private business. This was plainly a commercial business which resulted in one year of a profit of about $500,000 which was divided between the state and local municipalities. Such a holding seems to us far from indicating that it was ever applicable to agencies having customary governmental activities, such as development of roads, bridges and waterways entered upon with no profit motive."

It has been said that for an operation to become a governmental function, it is necessary that the public welfare require government in place of private ownership and operation and that it is the operation of the services by reason of its nature, which makes it essentially a government function. The fact is that in Puerto Rico the Insular Telegraph has always been owned and operated as an integral part of the government of the island. Under Spanish sovereignty, the Insular Telegraph was operated under the direction of a board known as "Administration of Post Office and Telegraph". Direction de Correos y Telégrafo. During the American occupation of Puerto Rico, it was used by the American Army. After the Treaty of Paris, under the terms of which Spain ceded Puerto Rico to the United States, the United States recognized the Insular Telegraph as a proper function of government by placing it under the control of the Government established, to wit: The People of Puerto Rico, to be administered for the benefit of the People of Puerto Rico. And the Legislative Assembly created by the Organic Act was given authority to legislate with respect to all matters in connection with said property. The Act of 1902 placed the Insular Telegraph under the Commissioner of the Interior. The Act of March 14, 1907 authorized the Commissioner of the Interior to provide for the extension of the Insular Telegraph Service by means of the construction, maintenance and operation of a system of long distance and local telephone lines to be operated in connection therewith and appropriated funds therefor. Pursuant to said authority a telephone system was established and today consists of approximately 1100 stations, the largest exchange being that in Caguas, serving approximately 600 stations. The Insular Telephone System employs approximately 35 employees. (It should be borne in mind that the Porto Rico Telephone Company, a private corporation, serves the greater part of the Island, its largest exchange being that of San Juan which serves more than 12,000 telephones.) To this day the only means by which the public can send a telegraphic communication to points within the island is through the use of the Insular Telegraph, now the Communications Authority. It has never been in the hands of private industry. It has played an im-

42

portant part during good seasons and during catastrophes in the development of the general welfare of the public at large. There is no indication that the Communications Authority is operated with a profit motive. The income, it would seem, will be used to pay operating expenses and the interest and principal on bonds.

All these considerations show that the operation of the telegraph and telephone system of Puerto Rico at all times has been exercised as an essential, traditional and customary governmental function, for a public purpose, regardless of whether the activity might have been exercised by a private concern. It might be of interest to note that Congress has recognized that the communication of intelligence in the territories is a proper and appropriate function of government. 48 U.S.C.A. § 302.

On May 19, 1942, the opinion of the Chief of the Wage and Hour Division, United States Department of Labor was requested in connection with the applicability of Section 3(d) to the Water Resources Authority of Puerto Rico, whose charter provisions mutatis mutandi, are almost identical with that of the Communications Authority. It was the opinion of the Wage and Hour Division that the Water Resources Authority was excluded from the Fair Labor Standards Act under section 3(d) thereof.

I do not believe that it can be doubted that the Department of the Interior of Puerto Rico is a political subdivision of the Insular Government.

In view of the statutory organization of the Puerto Rico Communications Authority; the historical and legislative background of the Insular Telegraph; in view of the fact that the activities of the Insular Telegraph, now The Puerto Rico Communications Authority has long been recognized as a governmental function including recognition as such by the Congress of the United States; in view of the Administrative ruling of the Wage and Hour Division, United States Department of Labor in connection with the Water Resources Authority; in view of the considerations herein expressed and the authorities cited, it is held that the Communications Authority is a political subdivision of the Government of Puerto Rico and falls within the language of Section 3(d), 29 U.S.C.A. § 203(d).

The Motion to Dismiss is sustained.