**BRIDGE AUTO RENTING CORPORATION et al. v. PEDRICK.**

**METROPOLITAN DISTRIBUTORS, Inc. v. JOHNSON.**

**No. 205, Docket 21265.**

United States Court of Appeals
Second Circuit.

May 10, 1949.

CLARK, Circuit Judge, dissenting.

———◆———

Weisman, Grant & Jaffe, of New York City (Herman L. Weisman and James B. Liberman, both of New York City, of counsel), for plaintiffs-appellants.

John F. X. McGohey, U. S. Atty., for the Southern District of New York, of New York City (Henry L. Glenn and John M. Cunneen, Asst. U. S. Attys., both of New York City, of counsel), for defendants-appellees.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CHASE, Circuit Judge.

These cases, which were consolidated for trial below, were brought to recover transportation taxes assessed under § 3475 of the Internal Revenue Code 26 U.S.C.A. § 3475, and paid to collectors within the Southern District of New York. The statutory conditions precedent to bringing the actions have all been complied with and the sole issue now is whether the taxes may be recovered. The district court dismissed the complaints on the merits and this appeal followed.

The above statute in so far as presently pertinent provides that: "(a) There shall be imposed upon the amount paid within the United States after the effective date of this section for the transportation * * * of property by * * * motor vehicle, * * * a tax equal to 3 per centum of the amount so paid, * * *. Such tax shall apply only to amounts paid to a person engaged in the business of transporting property for hire, including amounts paid to a freight forwarder, express company, or similar person * * *."

The appellant Metropolitan Distributors, Inc. has two wholly owned subsidiaries, Bridge Auto Renting Corporation and

Bridge Leasing Corporation. It is plain, and conceded, that for the purposes of this appeal they are all engaged in one business and that the two subsidiaries should be treated as departments of the parent corporation. We shall refer to them all as the appellant.

The appellant has for many years owned motor vehicles and garage facilities in the metropolitan area of New York City and has furnished to many other business concerns motor vehicles, which we shall hereinafter call trucks, under so-called leases to be used for the transportation of the property of the "lessees" principally for delivery of goods to their customers within the City of New York. Most of the appellant's trucks have been "leased" to customers who engaged, paid and directed their own drivers. But for forty-two of those customers the appellant provided a so-called payroll service, and it is on its receipts from such customers which the taxes now sought to be recovered were assessed and collected. These receipts were substantial in amount though they were but a comparatively small part of the gross revenue of the appellant.

The precise problem is whether the receipts taxed were within the meaning of the statutory language, "amounts paid ['for transportation * * * of property'] to a person engaged in the business of transporting property for hire." The rather complicated nature of the relationship of the appellant to the operation of its "leased" trucks makes the solution difficult and, as is so often true of close cases, the correct result depends upon where the emphasis correctly should be put. The sum of the appellant's contentions is that the facts show it to have been merely a "lessor" of trucks which it maintained in good condition for the use of its customers who transported their own property. The trial court held that on the facts shown it was a contract carrier which was within the statute by virtue of subdivisions (b) and (d) of Section 143.1 of Regulations 113 issued to be applicable to the statute on February 1, 1943. What it was depends necessarily upon a consideration of the whole relationship.

The following excerpts from the trial judge's opinion were treated below as findings of fact and are accurate and comprehensive. The first shows how the major portion of the appellant's business was done.

"The standard form of agreement used by Metropolitan recited that 'the lessor is the owner of and is engaged in the business of renting and leasing certain motor vehicles and supplying appurtenant services thereto' and that 'the lessee desires to lease such motor vehicles and services.' The leases were for a specified term, one or more years, with automatic extension for one year, unless terminated by either party on 60 days' notice, and with an option to the lessee to purchase the leased truck and terminate the lease by payment of the initial cost value of the truck, as fixed in the lease, less depreciation at an agreed rate. The rent reserved was usually a fixed amount per week for a stated average minimum weekly mileage, plus a stated amount for each mile in excess of the minimum.

"The lessor agreed to cause the leased truck to be duly registered to comply with traffic laws; to maintain the truck in good repair; to furnish all fuels, oil and lubricants; to keep the painting and lettering on the truck in good condition so that the truck would present a neat appearance at all times; to furnish garage storage space, together with complete garage service, including washing, polishing, cleaning, oiling and greasing; to promptly repair any disabled truck or to substitute another one therefor, if impractical to make repairs promptly; to supply additional trucks for temporary use if requested by the lessee; to furnish weekly to the lessee a statement of the time the chauffeur leaves and returns to the lessor's garage, including the number of miles run each day; and to assume sole responsibility and liability for death or injury to persons (excluding employees of the lessee while engaged in its business) and for damage to property (except property owned by, rented to or in charge of the lessee) resulting from negligence in the operation of the truck while being used or operated in the lessee's

usual course of business, other insurance covering liability of the lessee, obtained by the lessor, to be at the lessor's expense but subject to the lessee's approval as to the insurance carrier and the manner and amount of coverage.

"The lessee agreed to cause the truck 'to be operated solely by a safe and careful licensed chauffeur selected by and under the orders, directions, employment and pay of the lessee'; to remove any chauffeur against whom the lessor had complained because of reckless, careless or abusive handling of the truck, or other incompetence, and to substitute a competent chauffeur; not to substitute a chauffeur for the one who took out the truck except upon notice to the lessor; not to permit its chauffeurs to make any repairs or ad̓ ᵼ. ments or to operate the truck on flat tires or tires with insufficient air pressure; not to overload the truck; to immediately notify the lessor in the event of any accident, collision or disablement of the truck; to return the truck to the lessor's garage for at least four hours each day; to use the truck exclusively in the usual course of its business, and not to allow it to be used for any illegal purpose or outside the Metropolitan New York area; to use it on weekdays only, unless the lessor consented to Sunday use; and to pay any sales and use taxes and also 'any other new or additional taxes that may be imposed on the operation of the leased truck.'

"Each lease covered a specific truck or trucks, built (where not taken over from the lessee) to fit the special needs of the lessee, and painted and lettered in accordance with its instructions.

"None of the plaintiffs picked up and delivered merchandise, as public carriers do. They were not licensed as public carriers by the Interstate Commerce Commission or by the New York Public Service Commission. Nor were they required to obtain a license to engage in the business of public carting in the City of New York. People v. Bridge Auto Renting Corp., 272 N.Y. 637, 5 N.E.2d 369; People v. Heckman Trucking Co., 277 N.Y. 480, 14 N.E.2d 801.

"Metropolitan obtained registration plates for all its trucks. Each chauffeur obtained his own driving license and was responsible for his own violations of traffic regulations."

The second shows how the appellant conducted the business the receipts of which were taxed.

"The so-called payroll service agreements were sometimes oral, but were usually in the form of letters accepted by the lessee. There were two forms of these letters. The first form, signed by Metropolitan, appears to have been used prior to some time in 1944, and the other, signed by Bridge Leasing, thereafter.

"The first form provided that 'to facilitate the operation of our truck leasing agreement dated ———— we shall provide chauffeurs and/or helpers for the vehicles therein leased,' wages, hours of work and all other conditions governing their employment to be in accordance with prevailing conditions of the union having jurisdiction, the lessee 'to pay us all wages and overtime paid' to them 'together with our cost of compensation insurance, social security and unemployment taxes on such payroll.'

"The later form used the language 'We agree to obtain chauffeurs and/or helpers for your account to operate the vehicles leased by you' from the Metropolitan. It also provided that 'you shall have exclusive control and direction over' them and 'shall have the option of discontinuing these arrangements at any time.' In other respects the two forms were substantially the same.

"These payroll service agreements were entered into at the time that Metropolitan took over the trucks of a new customer, who thereupon became a lessee, or were made with a presently existing lessee. The only reasons appearing in the evidence are that the customer or lessee desired to be rid of the annoyance and work involved in preparing payrolls and payroll checks, arranging for the drivers to get their checks, and attending to the requirements of the various laws requiring payroll deductions, or, if the drivers had been unionized or were about to become so, to avoid negotiating with the unions. Agreements were not solicited, the payroll service was re-

ferred to only in answer to inquiries. After an agreement was entered into, the drivers were taken off the payroll of the lessee and placed on the payroll of Metropolitan or Bridge Leasing.

"The general method of operating, although there were some variations, was as follows. If a driver became unsatisfactory to the lessee, or left, either the lessee obtained a new driver and sent him to Metropolitan or Bridge Leasing, or one of the latter was notified and requested to obtain a new driver. If a driver became unsatisfactory to Metropolitan, the lessee was notified and the same procedure was followed. If the new driver was found satisfactory by the lessee, he was placed on the Metropolitan or Bridge Leasing payroll. If a driver failed to appear in the morning, the lessee was notified by Metropolitan; or, if the truck did not appear at the lessee's place of business at the appointed time, or the lessee desired an additional truck, the lessee would telephone Metropolitan. In either case the lessee might furnish a substitute or an additional driver, or ask that one be obtained for that day. Neither Metropolitan nor Bridge Leasing could discharge a driver without the consent of the lessee. No instructions were given by any of the plaintiffs to the drivers, except as to reporting accidents, breakdowns, etc. The drivers received from the lessee instructions as to their duties—when and where to report in the morning, what and where deliveries were to be made, etc. Wages and working conditions were fixed by the union contract or by the lessee; if complaints were made, they were made to the lessee. Union contracts were executed by Metropolitan or Bridge Leasing with the particular union having jurisdiction, usually on behalf of a named lessee, but only after the lessee had approved the contract or authorized its execution. Metropolitan had separate union contracts covering its own employees, who numbered 279 in 1946. Drivers on the Metropolitan or Bridge Leasing payroll had only such privileges, seniority rights, etc., as were given by the lessee; they did not participate in any of the benefits afforded by Metropolitan or Bridge Leasing to their employees, except that they were eligible, like all other drivers of Metropolitan's trucks, for 'no accident safety' awards. All C. O. D. collections made by drivers were turned over to the lessee, as well as all receipts for merchandise delivered, and special receipts for narcotics, liquors, etc. Neither Metropolitan nor Bridge Leasing was held responsible for lost or mis-delivered merchandise or for C. O. D.'s not turned in. If the lessees desired it, the drivers were bonded by Metropolitan or Bridge Leasing, the lessee paying the premium. Time records for each driver, showing overtime, if any, were kept and turned over weekly to the lessee for approval. Upon their return, approved, Metropolitan or Bridge Leasing made out payroll checks accordingly and caused them to be delivered to the drivers at the Metropolitan garage to which they reported. Metropolitan or Bridge Leasing paid the required amounts for workmen's compensation insurance, and federal unemployment and social security taxes, and billed the lessees weekly for these amounts and the wages paid by it, making no additional charge for its service. Bridge Leasing's only income, which was very small, came from charges for services rendered to Metropolitan. The required deductions on account of income taxes were also withheld. In making all these returns Metropolitan or Bridge Leasing, as the case might be, described itself as the employer and the drivers as its employees. Metropolitan sent separate bills to the lessees for the rentals.

"Defendants called representatives of three lessees, who, testified that, after their drivers had been placed on the Bridge Leasing payroll, there was no practical difference in their control over them, and that they were never considered by them as their employees. Some correspondence was also introduced in which these and a few other lessees made similar statements as to the drivers not being considered by them as their employees. And in one letter, dated December 18, 1944, Bridge Leasing wrote one of these lessees that it recognized that any chauffeurs supplied by it were its employees.

"Metropolitan carried public liability insurance on all its trucks, insuring it against

# 737

liability for damages to property of others and for personal injuries, except to the drivers themselves. It also carried insurance against its own liability for loss of merchandise through fire, collision or overturning, and, for a period apparently prior to 1943, it carried such insurance to the limited amount of $1,000. covering the lessee's liability therefor. But this was discontinued as being generally a duplication of the lessee's own insurance. It carried theft insurance only if requested by the lessee, and in such cases it billed the lessee therefor.

"Less than 10% of the lessees of Metropolitan had payroll agreements. For example, in 1946, Metropolitan had 520 lessees, of whom only 43 had such agreements. Metropolitan operated in 1946 a total of 1885 trucks, of which only 87 were rented to lessees who used the Bridge Leasing service. The total rentals paid in 1946 by lessees who used the Bridge Leasing service were only 6.8% of the total of $3,329,585. rentals collected."

The conclusion that the appellant was a contract carrier was reached upon an analysis of these facts in the light of the following decisions by the Interstate Commerce Commission; H. B. Church Truck Service Co., 1940, 27 M.C.C. 191; John J. Casale, Inc., 1946, 44 M.C.C. 107; and Motor Haulage Co. v. United States, 1946, 46 M.C.C. 107; Id., D.C.E.D.N.Y., 70 F. Supp. 17, affirmed 331 U.S. 784, 67 S.Ct. 1205, 91 L.Ed. 1815. While it is true that a contract carrier is a person engaged in the business of transporting property for hire within the terms of this taxing statute and the applicable regulations, that is but one classification of transporters of property whose receipts are taxed and we shall make no attempt to support the judgment by tagging the appellant a contract carrier. The question is whether what it actually did pursuant to the various terms of the agreements it made and performed adds up to enough to be substantially what it done by a person hired and paid to transport property by truck.

■ We may well start with that part of its business which it is conceded does not make it such a transporter. That is the larger part where it furnishes to its customers trucks which it maintains in operating condition either by repair or substitution and prescribes conditions to be observed by the "lessees" as to the operation of the trucks. In this operation it performs a very large part of the function of transportation, but it stops short of supplying a feature which is essential to the transportation of anything by means of a truck by failing to provide a driver. If it did provide trucks in this way and in addition its own employees as drivers, with directions to carry the property of its customers where, when and as they directed, it would seem perfectly clear that the money it received for so doing was for performing the service of carrying the property. It would then be doing almost all that any carrier does for its customers.

In the situation just stated the truck owner would be none the less transporting property because he was paid on a time plus mileage basis for the use of the truck and had no immediate incentive to operate efficiently. The result would be the same though the truck owner was merely reimbursed for the out-of-pocket expense of providing the drivers and could have no opportunity to make a profit on that phase of the operation. It is inconceivable that such a transporter of property would not, as a matter of business, have to provide suitable drivers, acceptable to his customers, for performing the kind of transportation undertaken efficiently. Nor would the fact that one or more of the customers itself insured its property as it saw fit while it was being transported make it the transporter.

■ So it would seem that decision here should turn upon the correct answer to an easily stated question. Did the appellant in fact furnish substantially all the facilities for, and perform substantially all of the functions of, transporting the property of the forty-two customers whose payments to it were taxed? It is in this connection that the decisions above cited under the Motor Carrier Act, 49 U.S.C.A. § 301 et seq., are helpful by analogy. While it is true that the purpose of that Act is different and so is the language, the

problem is much the same in that it requires separating the essentially important features from the non-essentials and drawing a more or less arbitrary line between complex fact situations differing but slightly. Without repeating in detail what the appellant did to earn the receipts which were taxed, it did in the aggregate all that was reasonably necessary to be done to transport its customer's property. Indeed, it is plain enough that these customers, regardless of what else they saw fit to do, had only to provide the goods for transport, direct the drivers where to take them and pay the appellant for performing the transportation service. It cannot be said that such service for pay did not make the appellant a person transporting property for hire to that extent even though in doing the greater part of its business it was otherwise engaged. While it may be that some of the M.C.C. decisions above cited rest in part on the fact that where a person is already engaged in the business of transporting property for hire, some special arrangement it makes for the use of part of its transportation facilities may be the more readily recognized as but a variation in form without a change in substance from its regular business, whatever does in fact amount to transporting property for hire brings the person who does it within this taxing statute although no other part of his business does so or has done so. For this reason Boston Elevated Railway Co. v. Malley, D.C., 288 F. 864, is an illustration of the correct solution of a similar problem. It must be owned that two cases seem to be to the contrary. Ohio River Sand Co. v. Commissioner, D.C.W.D.Ky., 60 F.Supp. 563, seems indistinguishable and we do not think it should be followed. Lyle v. United States, D.C.N.D.Ga., 76 F.Supp. 787, dealt only with the removal of dirt by a subcontractor within the limits of an airfield under construction and such "transportation" seems plainly outside the statute and regulations. When one looks into the detailed arrangement made and carried out, it is to be seen, we think that the service performed by the appellant under its payroll arrangements is quite different and was transportation of another's property for hire solely for delivery of the property itself according to the instructions of the customers.

Appellant suggests that in no event should the tax apply to more than the amounts paid to it in excess of what would have been paid for the concededly nontaxable rental service. However if the tax applies to any part of the receipts here in question, it applies to them in their entirety. All of what was done for the payroll service customers was part of its business of transportation and all of what was received for it was received for transportation. What was actually done for pay is what counts and not how the parties saw fit by agreement to allocate the payments to particular parts of the whole service performed by the appellant. The anomaly, if any, is inherent in the scheme of statutory classification.

While we realize that circumstances must control in each case and that in doubtful ones the final decision is the only "right" one, we hold for the reasons above stated that the decision below was not erroneous.

Judgment affirmed.

CLARK, Circuit Judge, dissenting in separate opinion.

CLARK, Circuit Judge (dissenting).

Appellant seems to me so completely in the business of renting trucks, rather than "of transporting property for hire," that I do not believe the decision below should stand. Admittedly that is so far true of some 90 per cent of its business that as to that there is not even a claim of taxability. As to the rest, the unpaid services in looking after some details of the personnel—apparently valuable because of appellant's ability to make arrangements with the unions and to afford employers insulation from such negotiations—do not seem to me to change the essential significance of the final control over the operations of the trucks left with appellant's customers. It is to be noted that the payments were based entirely upon the time-mileage use of the trucks, not upon carriage of specific goods. This was significant to show nontaxability as to the 90 per cent of the business; it

should not be overlooked as to this small balance. Further there is surely an anomaly in saying that this small gratuitous service for this limited group of customers renders the entire service as to them, renting and all, completely taxable.