**ASSOCIATED DRY GOODS CORPORA-TION, STEWART & COMPANY DIVISION**

v.

**UNITED STATES of America.**

**HUTZLER BROTHERS COMPANY**

v.

**UNITED STATES of America.**

**HOCHSCHILD, KOHN & COMPANY**

v.

**UNITED STATES of America.**

Civ. Nos. 11812–11814.

United States District Court
D. Maryland.
May 3, 1961.

Richard W. Case, Smith, Somerville & Case, Baltimore, Md., for plaintiffs.

John R. Hargrove, Asst. U. S. Atty., Baltimore, Md., Philip R. Miller, George T. Qualley, and Cynthia Holcomb, Attorneys, Department of Justice, Washington, D. C., for defendant.

THOMSEN, Chief Judge.

These three suits, consolidated for trial, have been brought for the refund of transportation taxes paid by plaintiffs to Delivery of Baltimore, Inc. (Delivery), for transmission to the government, for the period 1954 through 1958, plus interest as provided by law. The tax was imposed by sec. 3475(a) of the Internal Revenue Code of 1939 as amended, 26 U.S.C.A. § 3475(a), and by sec. 4271 and sec. 4272, I.R.C. of 1954, 26 U.S.C.A. §§ 4271, 4272; it was repealed in 1958.[1] For the purposes of this case there is no substantial difference between the two statutes. Sec. 3475(a), I.R.C., 1939, provided: "(a) There shall be imposed upon the amount paid within * * * the United States for the transportation of property by * * * motor vehicle, * * * a tax equal to 3 per centum of the amount so paid, * * *. Such tax shall apply only to amounts paid to a person engaged in the business of transporting property for hire, including amounts paid to a freight forwarder, express company, or similar person * * *."[2] The liability for payment

1. The tax first appeared in the Revenue Act of 1942 as a war measure, and was repealed June 30, 1958, P.L. 85–475, 72 Stat. 260.

2. Sec. 143.1(b) of Reg. 113, made applicable to the 1954 Code by T.D. 6091, C.B. 1954–2, 47, defines the term "person engaged in the business of transporting property for hire" to include a common carrier, contract carrier, local moving or drayage concern, freight forwarder, express company, or other person transporting property for hire wholly or in part by rail, motor vehicle, water, or air. The term "transportation" is defined in sec. 143.1(d) of Reg. 113 to mean the movement of property for hire, including

was on the shipper; the duty of collection, however, was on the carrier.

The questions at issue here are: Whether Delivery was "a person engaged in the business of transporting property for hire" within the meaning of the applicable statutes; whether all of the payments were "for the transportation of property"; and whether sec. 3313, I.R.C. of 1939, 26 U.S.C.A. § 3313, and sec. 6511, I.R.C. of 1954, 26 U.S.C.A. § 6511, limit plaintiffs' recovery to payments made after July 28, 1955.

### Findings of Fact [3]

1. Associated Dry Goods Corporation is a Virginia corporation. Stewart & Company (Stewart's) is a division of Associated, engaged in the business of selling department store items at retail from a central store in downtown Baltimore and from a branch store in a suburban area.

2. Hutzler Brothers Company (Hutzler's) is a Maryland corporation engaged in the business of selling department store items at retail from a central store in downtown Baltimore and from several branch stores in suburban areas.

3. Hochschild, Kohn & Company (Hochschild's) is a Maryland corporation engaged in the business of selling department store items at retail from a central store in downtown Baltimore, and from several branch stores in suburban areas.

4. A marked increase in the volume of sales in the years immediately prior to 1942, apprehension as to approaching scarcities of strategic materials, a desire to conserve gasoline and rubber tires, and a desire to reduce the cost of delivery led Hutzler's, Hochschild's and Stewart's (the three stores) in the latter part of 1941 to discuss the possibility of pooling the delivery service portion of their respective businesses.

5. As a result of these preliminary discussions, Delivery of Baltimore, Inc.

(Delivery), a Maryland corporation, was formed on January 23, 1942.

6. At the time of Delivery's incorporation, the three stores relinquished control of all personnel and all equipment which had theretofore been used by their respective delivery services. Title to all equipment was transferred to Delivery, and notes executed by Delivery in favor of the respective stores, were given in exchange for the equipment valued at its fair market value at the time of transfer. The rolling stock of the member stores was appraised by an appraisal company and sold at the appraised value to Delivery. The capital to purchase the rolling stock was provided Delivery by the member stores by means of notes which were to mature June 30, 1971, and which are redistributed annually among the three stores. (See F.F. 28–35). Employees of each of the three stores engaged in delivery service were transferred to Delivery immediately after its incorporation. Their seniority rights were maintained, and they receive the most favorable employee discounts, retirement privileges, vacations, sick pay and Christmas bonus, as well as Delivery's pension benefits. New employees of Delivery are hired by its management. Employees having five years' service with Delivery cannot be discharged except for cause and upon the approval of the member stores.

7. The board of directors of Delivery is elected by the stockholders, i. e. the three stores, at the annual meeting; by agreement between the member stores and Delivery three directors are elected from each of the three member stores. Delivery has held regular stockholders' and directors' meetings throughout the entire period of its corporate existence. The officers of Delivery rotate annually so that the president and treasurer are from one store, the vice-president from a second store, and the secretary from the third. Neither officers nor directors

---

interstate, intrastate, and intracity or other local movements.

[3]. Somewhat abbreviated from the formal findings filed with the Clerk.

receive compensation from Delivery for their services.

8. An operating committee consisting of a representative from each store is appointed by the board of directors. Its primary function is to operate as a liaison between the management of Delivery and the board of directors of Delivery. Delivery functions through a manager and an assistant manager who undertake the hiring and firing, supervision and direction of employees under the primary direction of the operating committee.

The members of the operating committee serve in this capacity without compensation.

9. Delivery's principal place of business is located at Kirk and Curtain Avenues, in Baltimore, where it owns four acres of land improved by a building which houses all of Delivery's rolling equipment except some shuttle equipment.

10. Delivery's operation is governed by an agreement dated October 12, 1948, entered into by the three stores and Delivery, and by several supplemental agreements. The agreements include the following provisions: "Each store hereby engages the Delivery Company to deliver for it * * * substantially all its packages * * *" and "Nothing herein is to be taken or construed as creating a relationship between the parties or any of them other than that of independent contractors, the stores as such having no control over the operations of the Delivery Company, or its officers, agents, servants and employees, and having no rights in connection with the Delivery Company except the rights of stockholders and those rights specifically given to them by this Agreement."

11. Package, Bulk, Shuttle, Department Car, and Sundry comprise the five divisions of Delivery's operations.

12. The Package Division delivers all packages not in excess of six feet in length and not in excess of fifty pounds (except books) for each of the three stores. The trucks used are titled in the name of Delivery, bear Delivery's legend, and have the names of the three member stores painted on the trucks in rotating order so that no store will consistently have top billing. The trucks are driven by Delivery employees, who handle both cash and charge deliveries, as well as c. o. d. deliveries and merchandise pickups. Packages are delivered to Delivery's facilities at Kirk and Curtain Avenues in Delivery's equipment (shuttle service) from the respective stores, warehouses or branch stores for delivery each day. The packages are metered out at Delivery's central operating headquarters into bins, or groups of bins, representing the various routes traveled by Delivery employees of the Package Division.

13. The Bulk Division delivers bulky merchandise of various sorts including packages which exceed the arbitrary limits established for the Package Division. The Bulk Division trucks handle only one store's merchandise at a time and most of the operations of the Bulk Division are conducted from the respective stores' service buildings. Trucks and drivers are requisitioned by the stores from Delivery's pool of trucks and drivers. The trucks bear the Delivery legend and the rotating names of the member stores. The supervision of the loading of the trucks and the establishment of the routes is the responsibility of the respective stores. Chauffeurs and helpers are Delivery employees who are subject to the same discipline, emoluments and personnel policies as other Delivery employees.

14. The Shuttle Division uses vehicles purchased by Delivery upon the direct order of the individual stores, and are used only in the business of that one store. These vehicles are not identical in character, but are built to the special physical specifications of the ordering store, and each of them bears the emblem and color scheme of that store. This equipment is driven by Delivery employees wearing Delivery uniforms, in intra-store transfers between the various locations owned and operated by each of the stores, as well as in deliveries to the

central office of Delivery from which all items, whether package or bulk, are delivered.

15. The Department Car Division includes specialized equipment such as panel trucks and station wagons, used for servicing the specialized departments of the several stores. Vehicles are titled in the name of Delivery, but carry the legend and color scheme of the respective stores. Drivers are supplied by the stores.

16. The Sundry Division furnishes repairs, gasoline, tires and the like to vehicles owned by the several stores.

17. Delivery does not have any permits issued by the Interstate Commerce Commission or the Public Service Commission of Maryland. It has not been considered a common or contract carrier under the Maryland law, and does not hold itself out as such. The various divisions are operated solely and exclusively for the three stores. No other shipper has or can avail itself of the services of Delivery except with the approval of all three stores.[4]

18. To meet the expenses involved in the day-to-day operation of each of its five divisions, Delivery bills each store monthy or twice monthly for its share of the cost of operating each division. These estimated bills are based on the previous year's experience of the cost of running each division and the proportional share of that cost attributable to each store.

19. Package Division billings are made twice monthly; 10% of the operating costs of the Package Division are divided equally among the three stores, irrespective of volume. The remaining 90% is prorated among the stores on the basis of the number of charged and paid packages, c. o. d. packages and merchandise pickups and calls made during that period. The bill is based on the "package rate" as determined by the management of Delivery on the basis of the previous year's package rate experience.

20. Shuttle Division billings are made once a month on the basis of a flat sum monthly rate determined on the basis of the previous year's experience. The monthly rate charged to a particular store includes an allowance for depreciation on the shuttle trucks assigned to that store, and the proportionate share of other costs chargeable to those trucks. In addition, these billings include a direct allocation to each store of salaries (regular and overtime) of the drivers who drove that store's shuttle trucks and the cost of gasoline consumed by that store's shuttle trucks.

21. Bulk Division billings are made once a month. The salaries of drivers and helpers, which represent nearly 70% of the costs of the Bulk Division, are allocated directly to the individual store, as they are in the Shuttle Division. So are the fringe benefits and the gasoline used by the Bulk trucks. The remainder of the operating costs, including occupancy, supervision, maintenance, depreciation, fire protection and all related inherent costs, are prorated among the stores on the basis of "truck day usage".

22. Department car billings are made once a month on the basis of the store's proportionate share of costs of operation on a monthly rate basis. In addition, these billings include a direct allocation of the cost of gasoline consumption.

23. At the end of each fiscal year the payments made by each store toward its share of the operation of each division are adjusted, individually for each division, and finally, individually for each store, so that each store will bear only its fair share of the cost of operating each division.

24. * * *

4. The broad charter purpose for which Delivery was incorporated was "to maintain, operate and conduct a delivery service within the State of Maryland for department stores and other merchants". Delivery has been requested to admit other stores on a basis similar to that of the three member stores, but has refused to do so due to the limitation of the space occupied by Delivery and the fact it was felt by the member stores not to be economically desirable.

25. The actual recorded costs of operating each of the five divisions of Delivery are accurately distributed to those divisions.

26. * * *

27. As a result of the application of the accounting procedures explained by the witnesses, there has been allocated to each of the three stores its proportionate share of the actual recorded operating costs of Delivery for each of its five divisions for each of the years involved in this case, i. e., 1954 through 1958, inclusive. These costs were paid by each of the stores for each of the years involved.

28. The capital of Delivery is composed of (1) $15,000, represented by 150 shares of no-par capital stock having a stated paid-in value of $100 a share, of which each store owns 50 shares, and (2) a series of notes, all due June 30, 1971, and all bearing interest only after their maturity.

29. The notes are designated: Regular Series, Bulk Series, Land Series, Building Series and Working Capital Series.

30. As additional capital is required by Delivery for its operation, such capital is supplied by the stores advancing to Delivery the required amounts in exchange for notes of the various classes described above.

31. Each series of notes is redistributed each year in such a way that each store is required to contribute capital in direct proportion to the use made by it of the capital assets owned by Delivery.

32. The series of notes known as the Regular Series comprises the capital costs associated with the Package Division. The total amount of these notes outstanding at the beginning of Delivery's fiscal year, plus any capital additions made during that year, less depreciation taken during that year, are redistributed to each of the stores on the basis of the packages carried during that year as shown in the allocation of operating costs to each store.

33. The series of notes known as the Bulk Series comprises the capital costs associated with Bulk, Shuttle and Department Car Divisions. The total amount of these notes outstanding at the beginning of Delivery's fiscal year, plus any capital additions made during that year, less depreciation taken during that year, are redistributed to each of the stores on the basis of the bulk, shuttle and department car services rendered to the stores for such year as developed by the allocation of operating expenses for such departments to each store.

34. The series of notes known as the Land Series represents the original cost of the land at Kirk and Curtain Avenues and remains at a constant figure, i. e. $102,500. The series of notes known as the Building Series represents the cost of the building at the Kirk Avenue location; this series increases each year, measured by the difference between the payments on the mortgage which covers the property and depreciation. These two series of notes are redistributed each year to the stores by first allocating their totals to the several divisions operated by Delivery and then distributing such allocated totals to the three stores based on the use by each store of each division.

35. The series of notes known as the Working Capital Series is $24,000 in amount and remains as a constant total. This series is redistributed to each of the three stores on the basis of their combined participation in all of the other series of notes.

36. Delivery carries its own general liability insurance as well as its own workmen's compensation coverage. These costs are also allocated to the various divisions and ultimately to the member stores. Delivery does not insure against theft or breakage of package items. The member stores carry these risks on their own merchandise.

37. Delivery is operated so as to have neither profit nor loss, and accordingly, from an accounting standpoint, has never had a profit or loss, nor any accumulated earnings. However, as a result of the repeal of sec. 462 of the Internal Reve-

nue Code of 1954, 26 U.S.C.A. § 462 (which section had provided for the accrual of reserves for estimated expenses) in June of 1955, Delivery filed Form 2175 showing income in the amount of $16,-561.50 attributable to accrued vacation pay and $1,800 attributable to accrued professional services. Delivery paid income tax of $1,475.20 for 1955 and $1,-246.71 for 1956.

38. No dividends have been paid on the outstanding stock.

39. No taxable income has accrued to or been reported by Delivery except as noted in F. 37. When such taxable income was found to exist, the tax was paid in the year of assessment and then allocated under appropriate formulae and cost-distributing principles as a cost of operation in the year in which the tax was paid.

40. Delivery has never been asked to deliver under contract for profit and has never done so; however, under its charter of incorporation Delivery has the authority to engage in the business of common or contract carrier, but could only do so by modifying the Agreement with the consent of all three stores.

41. The amount of Transportation Taxes at issue in this case and the quarters for which they were paid are set out in the Agreed Exhibits under the captions "Original Tax" and "Additional Tax Paid". The tax was billed by Delivery to the stores on invoices either monthly or twice monthly and adjusted proportionately at the end of each year among the three stores. The "Original Tax" was based on the following factors: (1) All costs allocated to the three stores from the Package Division; (2) All costs allocated to the three stores from the Bulk Division, except salaries of drivers and helpers and gasoline; (3) All costs allocated to the three stores from the Shuttle Division, except salaries of drivers and helpers and gasoline; and (4) All costs for vehicle usage associated with the Department Car Division except gasoline.

42. The "Additional Tax Paid" shown on the Agreed Exhibits represents a deficiency assessed to and paid on April 22, 1959, by the three stores. This tax was based upon (1) salaries of drivers and helpers associated with the Bulk and Shuttle Divisions, and (2) the cost of gasoline used by Hutzler's in connection with the Bulk and Shuttle Divisions. Against the additional tax so determined, there was deducted the amount of tax originally paid by the stores for the Department Car Division as explained in paragraph 41(4) above.

43. Each of the three stores and Delivery executed a Form 872B captioned "Consent Fixing Period of Limitation Upon Assessment of Miscellaneous or Excise Taxes", in July, 1958, and each of these forms was executed on behalf of the Acting District Director of Internal Revenue by H. Birdseil on July 28, 1958. By executing these forms, the three stores and Delivery agreed that Transportation Taxes imposed by secs. 3475 and 4271 of the 1939 and 1954 Internal . Revenue Code, respectively, for the periods April 1, 1954, to December 31, 1954, and April 1, 1955, to December 31, 1955, could be assessed at any time on or before July 31, 1959.

44. On April 21, 1959, each of the plaintiffs filed a Claim for Refund (IRS Form 843). These claims were denied by letters of disallowance dated August 21, 1959. Suits for refund were instituted on behalf of each plaintiff on November 30, 1959.

45. None of the taxes, neither the original taxes paid during the years 1954–1958, nor the additional taxes paid in January, 1959, have been refunded, either to Delivery or to any of the three stores. However, taxes paid attributable to the Department Car Division have been credited to taxpayers as noted in Finding 42.

### Discussion

#### I.

For the applicable statutes and regulations, see notes 1 and 2, supra. To be subject to the tax, the payments must.

have been made "for the transportation of property" to a "person engaged in the business of transporting property for hire".

In Kerns v. United States, 4 Cir., 204 F.2d 813, at page 815, Judge Parker said: "The tax was manifestly intended to apply to transportation for hire as that term is generally understood, i. e. such transportation as is furnished by common carriers, freight haulers, express companies, etc., who carry property from one place to another for compensation * * *."

As one would expect, many different arrangements have come before the courts for decision, and it is not easy to reconcile all of the opinions.[5]

The instant case differs from any other decision cited or found dealing with the transportation tax, in that the company furnishing the transportation services and facilities is owned and controlled by the three stores to which the various services and facilities are furnished, and is so operated by them that it shall have neither a profit nor a loss, but shall distribute all costs and expenses of its operation among the three stores in proportion to the use they make of its facilities [6]

Plaintiffs contend that a profit motive is a necessary element of engaging in the business of transporting property for hire. It is true that a profit motive is ordinarily involved in that business as well as in other businesses, but the statute is broad enough to cover operations which do not involve a profit

motive, although it existed in all cases cited or found in which the tax has been imposed.[7]

It is clear that Delivery is not a common carrier. Plaintiffs contend that it is not a contract carrier either, and note that in most if not all of the cases in which the tax was held applicable, the concern furnishing the services was a contract carrier, as that term is generally understood. However, in Bridge Auto Renting Corp. v. Pedrick, 2 Cir., 174 F.2d 733, the court held that to sustain the tax it was not necessary to "tag" the appellant a contract carrier. "The question is whether what it actually did pursuant to the various terms of the agreements it made and performed adds up to enough to be substantially what is done by a person hired and paid to transport property by truck." 174 F.2d at page 737. The court said that the decision turned upon the correct answer to an "easily stated" question: "Did the appellant in fact furnish substantially all the facilities for, and perform substantially all of the functions of, transporting the property of the forty-two customers whose payments to it were taxed?" 174 F.2d at page 737.

The agreement between the three stores and Delivery characterizes that company as an independent contractor. Nevertheless, plaintiffs contend that substance, not form, should control; that in substance Delivery is a pooling agreement, a joint enterprise, which acts for the three stores to assist them and each of them in rendering services which are a part of their regular business.

5.  Compare Kerns v. United States, 4 Cir., 204 F.2d 813; Ohio River Sand Co. v. United States, W.D.Ky., 60 F.Supp. 563; Continental Oil Co. v. Jones, W.D.Okl., 92 F.Supp. 927; Edward H. Ellis & Sons, Inc. v. United States, 3 Cir., 187 F.2d 698; Castle Shannon Coal Corp. v. United States, W.D.Pa., 98 F.Supp. 163; Masonite Corp. v. Fly, 5 Cir., 194 F.2d 257, with Bridge Auto Renting Corp. v. Pedrick, 2 Cir., 174 F.2d 733; John J. Casale, Inc. v. United States, 86 F.Supp. 167, 114 Ct.Cl. 599; Getchell Mine, Inc. v. United States, 9 Cir., 181 F.

2d 987; Gulf Coast Towing Co. v. United States, 5 Cir., 196 F.2d 944; Hines Lumber Co. v. United States, 7 Cir., 239 F.2d 488.

6.  On the other hand, the arrangement was entered into and is continued by the stores primarily because they believe it helps them to make profits.

7.  For somewhat analogous situations, see Lowe v. Public Service Com., 116 Utah 376, 210 P.2d 558; Merchants Mutual Ass'n v. Matthews, 110 Fla. 325, 149 So. 27.

The pooling arrangement might have been operated as an unincorporated agency or joint venture or, as in fact it was, as a separate corporation. No doubt an unincorporated joint venture could have been operated in such a way that no tax would have been payable on any of the amounts which each store paid for its share of the costs of the joint operation, especially since the arrangement was entered into originally in order to conserve tires and gasoline during the war and for other business purposes, and not to avoid taxes or other governmental controls. However, for business reasons, the stores chose to operate the combined delivery service through a separate corporation organized, owned and operated by the three stores.[8] Although it is generally true that substance and not form should control, there are situations in which a court cannot properly ignore the form which taxpayers have deliberately given to their transaction. Moline Properties, Inc. v. C. I. R., 319 U.S. 436, 439, 63 S.Ct. 1132, 87 L.Ed. 1499.[9]

In Schenley Distillers Corp. et al. v. United States, 326 U.S. 432, 66 S.Ct. 247, 249, 90 L.Ed. 181, the Court held that Schenley Distillers Motor Division, Inc., a wholly owned subsidiary of Schenley Distillers Corp., was a "contract carrier", needing a permit under Part II of the Interstate Commerce Act, 49 U.S. C.A. § 303(a) (15, 17), and not a "private carrier", which needed no such permit. Appellant's contention to the contrary was based on the fact that its operations were to be performed for its parent and for other corporations owned or controlled by the parent, and that the transportation would be in furtherance of one commercial enterprise. The Supreme Court said: "One who has created

a corporate arrangement, chosen as a means of carrying out his business purposes, does not have the choice of disregarding the corporate entity in order to avoid the obligations which the statute lays upon it for the protection of the public." 326 U.S. 436, 437, 63 S.Ct. 1132. See also Interstate Transit Lines v. C. I. R., 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607, and National Carbide Corp. v. C. I. R., 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779.

## II.

It will be necessary, therefore, to analyze the various services and facilities which Delivery furnished to the three stores to determine whether some, all or none of the payments made by the three stores to Delivery were amounts paid "for the transportation of property" within the meaning of the statutes and applicable regulations.

That analysis should be made on a division by division basis. No one has ever suggested that the amounts paid for the costs of the Sundry Division (F. 16, supra) were subject to the tax. The government also concedes that the amounts paid for the costs of the Department Car Division (F. 15) are not subject to the tax, primarily because the equipment furnished to the stores by that Division was operated by employees of the several stores. That leaves the Package, the Bulk, and the Shuttle Divisions, of which the Package Division is by far the largest.

(a) Until this case arose the three stores had always paid the tax on all amounts paid by them for all costs of the Package Division. It seems quite clear that with respect to the operations of that division, Delivery was doing sub-

8. The delivery enterprise was given a corporate form to limit its liability and to avoid the joint liability of the three stores for its debts and its torts which would have existed if the operation had been carried on as an unincorporated joint venture.

9. Plaintiffs contend that Moline and related cases teach only that a privately owned

corporation must be treated as a separate taxable entity for income tax purposes (unless it is a sham, or is being used for some improper purpose) and call attention to the fact that they have always treated Delivery as a separate entity for income tax purposes. But the cases cited by the government go further.

stantially what is done by a person hired and paid to transport property by truck; that it was furnishing substantially all of the facilities for, and performing substantially all of the functions of, transporting the property of the three stores. Bridge Auto Renting Corp. v. Pedrick, supra. Not only did Delivery own the trucks and employ and control the drivers engaged in the operation of the Package Division, it also owned and operated the bins and other equipment in the building on Kirk Avenue to which the three stores separately delivered their packages, to be commingled and delivered to the customers along the various routes. Ten percent of the operating costs of the Package Division was divided equally among the three stores, irrespective of volume; the remaining ninety percent was prorated among the stores on the basis of packages carried. The depreciation on the trucks and other equipment chargeable to the Package Division was included among the operating costs so distributed. The notes representing the cost of such equipment were redistributed among the stores annually on the same basis; no interest was charged or paid on any of the notes during the years in question.

Plaintiffs argue that the facilities—the real estate, improvements, trucks, etc.—have in fact been "furnished" by the three stores and paid for by them in proportion to their respective use of the facilities. In a broad sense this is true, but with respect to the Package Division the facilities have been provided for a consolidated, commingled package delivery service, operated by a separate corporation which the stores had created and which they controlled and operated in accordance with the provisions of the general agreement.

For the reasons discussed in "I" above, I conclude that the amounts paid by the three stores for the costs of the Package Division were paid for the transportation of property.

(b) The Shuttle Division presents a different picture. Although the trucks were owned by Delivery, they were purchased by Delivery upon the direct order of the individual stores, built to the special physical specifications of the ordering store, painted in its colors and bearing its emblem, and most importantly, used only in the business of that one store, in intra-store transfers among the various locations owned and operated by it, and for carrying merchandise from those locations to Delivery's building on Kirk Avenue. And although the drivers were hired and fired by Delivery, a large measure of control over their day to day operations was exercised by the individual store to which a particular driver was assigned.[10] Again, most importantly, the salaries of chauffeurs and helpers were charged directly to the store to which they were assigned each day. The gasoline used by the Shuttle trucks was charged directly to the store using it; indeed special pumps for that purpose were located at Hochschild's warehouse and at Stewart's warehouse. The cost of lubricants (a small item) was apportioned on the basis of the gasoline used. All other costs, such as repairs, tires and tubes, insurance, licenses, taxes and depreciation, were charged directly to the store which had ordered the truck, was using it exclusively, and had really paid for it, taking a note from Delivery for accounting purposes.[11]

The government argues that these facts are similar to those in Bridge Auto Renting Corp. v. Pedrick, supra. They are, with the controlling distinction that Bridge was entirely independent of its many customers, paid for the equipment itself, and derived a profit from its opera-

---

10. If equipment was left overnight at the store's warehouse or at a branch store, the driver would report there rather than to Kirk Avenue.

11. Aside from the fact that the Shuttle Division trucks are operated by drivers and helpers employed by Delivery but whose salaries are charged directly to the stores, the cost of the Shuttle Division are handled in the same way as the costs of the Department Car Division.

tions. In the instant case the Shuttle trucks were in substance furnished and paid for by the individual stores, and each store paid the exact cost of the operation of its shuttle trucks, which were charged to it directly. True, Delivery was legally an independent contractor, but with respect to the Shuttle Division it was acting as the representative of the several individual stores and was not conducting a consolidated, commingled service. The general principles announced by the Fourth Circuit in Kerns, supra, and by other courts, come into play.

I conclude that the amounts paid by the several stores based upon the costs of the Shuttle Division were not paid "for the transportation of property" within the meaning of the statutes and regulations.

■ (c) The Bulk Division presents a more difficult question. The trucks were purchased by Delivery and maintained as a pool, from which the individual stores drew trucks as needed. Bulk trucks handled only one store's merchandise at a time. They were customarily requisitioned for a day or for a longer period. They were loaded under the supervision of the individual store they were serving at the time, and that store established the route to be followed. Some of the Bulk equipment was garaged in the service buildings of the several stores from time to time, and a driver customarily reported to the location— store, warehouse or Kirk Avenue—where the truck or tractor to which he was assigned spent the night.

The salaries of drivers and helpers, which represented nearly 70% of the costs of the Bulk Division, were charged directly to the stores, as they were in the Shuttle Division. So was the gasoline. The small item for lubricants was handled in the same way as in the Shuttle

Division. The remainder of the operating costs was prorated among the stores on the basis of truck working days.[12] Since the truck worked for only one store at a time that was essentially a direct charge.

Aside from the fact that the trucks were drawn from a pool[13], there was little difference between the operation and the distribution of the costs of the Bulk Division and those of the Shuttle Division. The most important items were charged directly to the individual stores in exactly the same way as in the Shuttle Division.

I conclude that the amounts paid by the several stores based upon the costs of the Bulk Division were not paid "for the transportation of property" within the meaning of the statutes and regulations.

III.

The quarterly returns of each plaintiff for the year 1954 were filed and the tax shown thereby (the original tax) paid on April 15, 1954, July 23, 1954, October 13, 1954, and February 16, 1955. The corresponding dates for 1955 were May 3, 1955, July 27, 1955, October 18, 1955, and January 31, 1956. Similar returns were filed and taxes paid through the second quarter of 1958, after which the tax was repealed.

The government audited the returns in 1958 and claimed that additional taxes were payable. Accordingly, on or before July 28, 1958, each of the three stores and Delivery executed an agreement under sec. 6501(c) (4), I.R.C. of 1954, 26 U.S.C.A. § 6501(c) (4),[14] and each of these forms was executed on behalf of the Acting District Director of Internal Revenue on July 28, 1958. By executing these forms, the three stores and Delivery agreed that transportation taxes imposed by secs. 3475 and 4271 of the 1939 and 1954 Internal Revenue Code, respec-

12. I.e. the ration which the total number of Bulk truck working days for a particular store bears to the total Bulk truck working days of all three stores.

13. For the method of redistributing annually the notes representing the cost of the Bulk equipment see F. 33.

14. U. S. Treasury Department-Internal Revenue Form 872B, which is captioned "Consent Fixing Period of Limitation Upon Assessment of Miscellaneous or Excise Taxes".

tively, for the periods April 1, 1954, to December 31, 1954, and April 1, 1955, to December 31, 1955, could be assessed at any time on or before July 31, 1959.

Additional taxes for those periods were assessed directly against the three stores (plaintiffs) in January, 1959, and were paid on April 22, 1959. The claims for refund of both the original and additional taxes were filed by each plaintiff on the same day, April 22, 1959.

Sec. 3313, I.R.C. of 1939, provided that claims for refund should be filed within four years after the payment of the tax, sec. 6511, I.R.C. of 1954, as amended, three years.[15]

■ Both parties are agreed that claims for refund of the original taxes paid for the first quarters of 1954 and 1955 are barred by the four year and three year periods of limitation respectively applicable. The claims for refund for original taxes paid for the second quarters of 1954 and 1955 are also barred, because the payments of the original taxes for those quarters were also made more than four years and three years respectively. before the effective date of the waiver agreement (July 28, 1958). See Treas.Reg. § 301.6511(c)–1(d).

■ The government concedes that limitations does not bar the claims for refund of payments made after July 28, 1955, i. e. (1) the payments of original taxes for the third quarter of 1955 and subsequent quarters, and (2) all payments of additional taxes. The only question is about the original taxes for the third and fourth quarters of 1954. This question turns on whether sec. 6511, I.R.C. of 1954, adopts the four year period of the 1939 Code with respect to the limit on amount provided for in sec. 6511 (c) (2). That paragraph refers to "the period which would be applicable under subsection (b) (2)", and that period is "the three years immediately preceding the filing of the claim". I hold that sec. 6511(c) (2) means what it says and does not adopt the four year period of the corresponding section of the 1939 Code,

---

15. Sec. 6511, I.R.C. of 1954, as amended and in effect in July, 1958, provides:
"*Limitations on credit or refund*

"*(a) Period of limitation on filing claim.*—Claim for credit or refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within 3 years from the time the return was filed * * *.

"*(b) Limitation on allowance of credits and refunds.*—

"*(1) Filing of claim within prescribed period.*—No credit or refund shall be allowed or made after the expiration of the period of limitation prescribed in subsection (a) for the filing of a claim for credit or refund, unless a claim for credit or refund is filed by the taxpayer within such period.

"*(2) Limit on amount of credit or refund.*—

"*(A) Limit to amount paid within 3-year period.*—If the claim was filed by the taxpayer during the 3-year period prescribed in subsection (a), the amount of the credit or refund shall not exceed the portion of the tax paid within the period, immediately preceding the filing of the claim, equal to 3 years plus the period of any extension of time for filing the return. * * *

* * * * * * *

"*(c) Special rules applicable in case of extension of time by agreement.*—If an agreement under the provisions of section 6501(c) (4) extending the period for assessment of a tax imposed by this title is made within the period prescribed in subsection (a) for the filing of a claim for credit or refund—

"*(1) Time for filing claim.*—The period for filing claim for credit or refund or for making credit or refund if no claim is filed, provided in subsections (a) and (b) (1), shall not expire prior to 6 months after the expiration of the period within which an assessment may be made pursuant to the agreement or any extension thereof under section 6501(c) (4).

"*(2) Limit on amount.*—If a claim is filed * * * after the execution of the agreement and within 6 months after the expiration of the period within which an assessment may be made pursuant to the agreement or any extension thereof, the amount of the credit or refund shall not exceed the portion of the tax paid after the execution of the agreement and before the filing of the claim or the making of the credit or refund, as the case may be, plus the portion of the tax paid within the period which would be applicable under subsection (b) (2) if a claim had been filed on the date the agreement was executed. * * *"

although I recognize the equities of plaintiffs' argument on this point.

Plaintiffs' claims for refund of original taxes for the third and fourth quarters of 1954 are barred.

Counsel will prepare and settle judgments, for the several plaintiffs based upon the facts found and conclusions stated herein.